# ASARCO INC. *v.* IDAHO STATE TAX COMMISSION

No. 80–2015.   Argued April 19, 1982—Decided June 29, 1982

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 331. O'CONNOR, J., filed a dissenting opinion, in which BLACKMUN and REHNQUIST, JJ., joined, *post*, p. 331.

*George W. Beatty* argued the cause for appellant. With him on the briefs were *C. Rudolf Peterson, William L. Goldman, James A. Riedy, Philip E. Peterson*, and *Alexander J. Gillespie, Jr.*

*Theodore V. Spangler, Jr.*, Deputy Attorney General of Idaho, argued the cause for appellee. With him on the brief was *David H. Leroy*, Attorney General.*

JUSTICE POWELL delivered the opinion of the Court.

The question is whether the State of Idaho constitutionally may include within the taxable income of a nondomiciliary

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Illinois by *Tyrone Fahner*, Attorney General, *Fred H. Montgomery*, Special Assistant Attorney General, and *Lloyd B. Foster;* and for the Multistate Tax Commission et al. by *William D. Dexter; Wilson L. Condon*, Attorney General of Alaska; *J. D. MacFarlane*, Attorney General of Colorado; *Carl R. Ajello*, Attorney General of Connecticut; *Richard S. Gebelein*, Attorney General of Delaware; *David H. Leroy*, Attorney General of Idaho, and *Theodore V. Spangler, Jr.*, Deputy Attorney General; *Linley E. Pearson*, Attorney General of Indiana; *Robert T. Stephan*, Attorney General of Kansas; *Stephen H. Sachs*, Attorney General of Maryland; *Francis X. Bellotti*, Attorney General of Massachusetts; *Frank K. Kelley*, Attorney General of Michigan; *Warren R. Spannaus*, Attorney General of Minnesota; *John Ashcroft*, Attorney General of Missouri; *Paul L. Douglas*, Attorney General of Nebraska; *Gregory H. Smith*, Attorney General of New Hampshire; *Jeff Bingaman*, Attorney General of New Mexico; *Rufus L. Edmisten*, Attorney General of North Carolina, and *M. C. Banks*, Deputy Attorney General; *Robert O. Welfald*, Attorney General of North Dakota, and *Albert R. Hausauer*, Assistant Attorney General; *Dave Frohnmayer*, Attorney General of Oregon; and *David L. Wilkinson*, Attorney General of Utah.

*John J. Easton*, Attorney General of Vermont, and *Paul P. Hanlon* filed a brief for the State of Vermont as *amicus curiae*.

parent corporation doing some business in Idaho a portion of intangible income—such as dividend and interest payments, as well as capital gains from the sale of stock—that the parent receives from subsidiary corporations having no other connection with the State.

I

This case involves corporate income taxes that appellee Idaho State Tax Commission sought to levy on appellant ASARCO Inc. for the years 1968, 1969, and 1970. ASARCO is a corporation that mines, smelts, and refines in various States nonferrous metals such as copper, gold, silver, lead, and zinc. It is incorporated in New Jersey and maintains its headquarters and commercial domicile in New York. ASARCO's primary Idaho business is the operation of a silver mine. It also mines and sells other metals and operates the administrative office of its northwest mining division in Idaho. According to the appellee's tax calculations, approximately 2.5% of ASARCO's total business activities take place in Idaho. App. 59a, 67a, and 75a.

During the years in question, ASARCO received three types of intangible income of relevance to this suit.[1] First, it collected dividends from five corporations in which it owned major interests: M. I. M. Holdings, Ltd.; General Cable Corp.; Revere Copper and Brass, Inc.; ASARCO Mexicana, S. A.; and Southern Peru Copper Corp.[2] Second,

---

[1] ASARCO also received other intangible income, but the proper tax treatment of that income is not at issue in this case.

[2] M. I. M. Holdings, Ltd., is a publicly owned corporation engaged in the mining, milling, smelting, and refining of nonferrous metals in Australia and England. ASARCO owned about 53% of M. I. M.'s stock during the period in question. General Cable Corp. and Revere Copper and Brass, Inc., are publicly owned companies that respectively fabricate cables and manufacture copper wares. ASARCO owned about 34% of the stock of each. ASARCO Mexicana, S. A., engages in Mexico in the same general line of business as does ASARCO in the United States. ASARCO owned 49% of Mexicana. Southern Peru Copper Corp. mines and smelts

ASARCO received interest income from three sources: from Revere's convertible debentures; from a note received in connection with a prior sale of Mexicana stock; and from a note received in connection with a sale of General Cable Stock. Third, ASARCO realized capital gains from the sale of General Cable and M. I. M. stock.

In 1965, Idaho adopted its version of the Uniform Division of Income for Tax Purposes Act (UDITPA).[3] See Idaho Code § 63–3027 (1976 and Supp. 1981); 7A U. L. A. 91 (1978). Under this statute, Idaho classifies corporate income from intangible property as either "business" or "nonbusiness" income. "Business" income is defined to include income from intangible property when "acquisition, management, or disposition [of the property] constitute[s] integral or necessary parts of the taxpayers' trade or business operations."[4] Idaho apportions such "business" income according

---

copper in Peru. ASARCO owned about 51.5% of Southern Peru during the time at issue.

[3] The UDITPA is a tax allocation system approved in 1957 by the National Conference of Commissioners on Uniform State Laws and by the American Bar Association. See 7A U. L. A. 91 (1978). At least 23 States have adopted substantially all of the UDITPA to date. See *id.*, at 10 (Supp. 1982); Brief for State of Illinois as *Amicus Curiae* 1–2. The UDITPA has been adopted as Article IV of the Multistate Tax Compact. See *United States Steel Corp.* v. *Multistate Tax Comm'n*, 434 U. S. 452, 457–458, n. 6 (1978).

[4] Idaho Code § 63–3027(a)(1) (Supp. 1981). The complete definition provides that " '[b]usiness income' means income arising from transactions and activity in the regular course of the taxpayers' trade or business and includes income from the acquisition, management, or disposition of tangible and intangible property when such acquisition, management, or disposition constitute[s] *integral or necessary parts of the taxpayers' trade or business operations.* Gains or losses and dividend and interest income from stock and securities of any foreign or domestic corporation shall be presumed to be income from intangible property, the acquisition, management, or disposition of which constitute an integral part of the taxpayers' trade or business; such presumption may only be overcome by clear and convincing evidence to the contrary." *Ibid.* (emphasis added). See UDITPA, § 1(a), 7A U. L. A. 93 (1978).

to a three-factor formula and includes this apportioned share of "business" income in the taxpayer's taxable Idaho income.[5] "Nonbusiness" income, on the other hand, is defined as "all income other than business income." Idaho Code § 63–3027(a)(4) (Supp. 1981). Idaho allocates intangible "nonbusiness" income entirely to the State of the corporation's commercial domicile instead of apportioning it among the States in which a corporate taxpayer owns property or carries on business.[6]

Idaho is a member of the Multistate Tax Compact, an interstate taxation agreement concerning state taxation of multistate businesses. The Compact established the Multistate Tax Commission, which is composed of the tax adminis-

---

[5] "All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three (3)." Idaho Code § 63–3027(i) (Supp. 1981).

"The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period." § 63–3027(j). "The payroll factor is a fraction, the numerator of which is the total amount paid in this state during the tax period by the taxpayer for compensation, and the denominator of which is the total compensation paid everywhere during the tax period." § 63–3027(m). "The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period." § 63–3027(o).

[6] "Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's commercial domicile is in this state, unless such gains and losses constitute business income as defined in this section." Idaho Code § 63–3027(f)(3) (Supp. 1981). "Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in this state unless such interest or dividends constitute business income as defined in this section." § 63–3027(g).

Idaho defines "commercial domicile" as "the principal place from which the trade or business of the taxpayer is directed or managed." § 63–3027(a)(2).

trators from the member States.[7]   Article VIII of the Compact provides that any member State may request that the
Commission perform an audit on its behalf.   See *United
States Steel Corp.* v. *Multistate Tax Comm'n,* 434 U. S. 452,
457 (1978) (upholding the Compact against a facial attack
on Compact and Commerce Clauses and Fourteenth Amendment grounds).

In 1971, the Multistate Tax Commission audited
ASARCO's tax returns for the years in question on behalf of
six States, including Idaho.   The auditor recommended adjusting ASARCO's tax computations in several respects.   As
accepted by the Idaho State Tax Commission and as relevant
to the present dispute, the auditor first "unitized"—or
treated as one single corporation—ASARCO and six of its
*wholly* owned subsidiaries.[8]   As a consequence of unitization, the auditor combined ASARCO's income with that of
these six subsidiaries and disregarded (as intracompany
accounting transfers) the subsidiaries' dividend payments
to ASARCO.   Cf. *United States Steel Corp.* v. *Multistate Tax
Comm'n, supra,* at 473, n. 25.   The auditor listed five factors
thought to justify unitizing treatment.   First, ASARCO

---

[7] Presently 19 States and the District of Columbia have joined the Compact as full members.   Eleven States have joined as associate members.
Brief for Multistate Tax Commission and Participating States as *Amici
Curiae* 2.

[8] Idaho law provides that "two . . . or more corporations the voting stock
of which is more than fifty percent . . . owned directly or indirectly by a
common owner or owners may, when necessary to accurately reflect
income, be considered a single corporation."   Idaho Code § 63–3027(s)
(Supp. 1981).

The six unitized subsidiaries are Federated Metals of Canada; ASARCO
Mercantile Co.; Enthone, Inc.; International Mining Co.; Lone Star Lead
Construction Corp.; and Northern Peru Mining Corp.

The auditor also stated that Southern Peru Copper Corp. and Southern
Peru Copper Sales Corp. "were deemed unitary and were combined only
for those states in which ownership of less than 80% presents no problem."
App. 88a.   See *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont,* 445
U. S. 425, 435, n. 12 (1980).   These two corporations were not "deemed
unitary" in Idaho.

owned a majority (in fact, all) of the stock of each subsidiary. Second, "ASARCO, with its subsidiaries, conducts a vertically integrated non-ferrous metals operation.   This is evidenced by the flow from the mines to the smelters to the refineries and ultimately to the sales made by the New York office."   App. 88a.   Third, "ASARCO and its subsidiaries have interlocking officers and directors, which enables ASARCO to control the major management decisions of each subsidiary."   *Ibid.*   Fourth, sales between the companies were numerous, making it "apparent . . . that the companies supplied markets to each other . . . ."   *Id.*, at 89a.   And finally, various services were provided to the ASARCO group either by ASARCO or by subsidiaries specifically set up for such a purpose.[9]   The propriety of this treatment of the six wholly owned subsidiaries is not an issue before us.

The auditor found the situation to differ with respect to ASARCO's interest in M. I. M., General Cable, Revere, Mexicana, and Southern Peru.   This judgment planted the seed of the current dispute.   As to these five companies, the auditor determined that the links with ASARCO were not sufficient to justify unitary treatment.   Nonetheless, he found that ASARCO's receipt of dividends from each of these did constitute "business" income to ASARCO.   See n. 4, *supra*.   The auditor similarly classified the interest and capital gains income at issue in this case.   These categories of income also were added in ASARCO's total income to be apportioned among the various States in which ASARCO was subjected to an income tax.

The Idaho State Tax Commission adopted the auditor's ad-

---

[9] The auditor noted that ASARCO Mercantile bought and sold equipment for the subsidiaries and that International Metals acted as ASARCO's foreign sales agent.   He further observed that exploration, research and development, insurance procurement, and tax preparation were performed jointly for most or all of these companies.   Finally, he stated that ASARCO's audit staff examined the operations of these subsidiaries to enable "ASARCO to know whether the subsidiaries are operating along the lines set down by its management."   App. 90.

justments in an unreported decision.  App. to Juris. Statement 46a.  In rejecting ASARCO's challenge to the auditor's unitized treatment of the six wholly owned corporations, see n. 8, *supra*, the Commission stated that it was "quite clear from the evidence produced at the hearing that [ASARCO's] business activities are so inter-related as to defy measurement by separate accounting . . . ."  App. to Juris. Statement 49a–50a.  The Commission likewise upheld the auditor's conclusion that the dividends presently at issue were properly treated as apportionable "business" income.  It consequently assessed tax deficiencies against ASARCO of $92,471.88 for 1968, $111,292.44 for 1969, and $121,750.76 for 1970, plus interest.

On ASARCO's petition for review, the State District Court upheld the Commission's unitized treatment of the six subsidiaries in an unpublished opinion.  The court, however, overruled the Commission's determination that the disputed dividends, interest, and capital gains constituted "business" income, on the reasoning that this income did not come from property or activities that were "an integral part of [ASARCO's] trade or business."  Idaho Code § 63–3027(a)(1) (Supp. 1981).  In the court's view, "if the dividend income from other corporations is an integral part of the business of [ASARCO] . . . they should be unitized and all matters considered and[,] if they are not[,] . . . the income is not business income but is [nonapportionable] non business income."  App. to Juris. Statement 37a.

The Commission, but not ASARCO, appealed to the Idaho Supreme Court.  That court held that the trial court had erred by excluding from "business" income ASARCO's receipt of dividends, interest, and capital gains as a result of its owning stock in the five corporations.[10]  *American Smelting*

---

[10] The Idaho Supreme Court also ruled that ASARCO's receipt of certain rents and royalties, as well as its receipt of dividends from Compania American Smelting, S. A., constituted apportionable "business" income. It further upheld the trial court's "nonbusiness" income classification with

& *Refining Co.* v. *Idaho State Tax Comm'n*, 99 Idaho 924, 935–937, 592 P. 2d 39, 50–52 (1979). In response to ASARCO's constitutional arguments, the court decided that this tax treatment withstood attack under the Commerce and Due Process Clauses. We vacated and remanded the case for reconsideration in light of our decision in *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont*, 445 U. S. 425 (1980). *ASARCO Inc.* v. *Idaho State Tax Comm'n*, 445 U. S. 939 (1980). The Idaho Supreme Court reinstated its previous opinion in a brief *per curiam* order on March 4, 1981. 102 Idaho 38, 624 P. 2d 946. We noted probable jurisdiction, 454 U. S. 812 (1981), and we now reverse.

## II

As a general principle, a State may not tax value earned outside its borders. See, *e. g.*, *Connecticut General Life Ins. Co.* v. *Johnson*, 303 U. S. 77, 80–81 (1938).[11] The broad inquiry in a case such as this, therefore, is "whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return." *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 444 (1940).

Our application of this general principle in this case is guided by two of our recent decisions. In *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont, supra*, the taxpayer conducted "an integrated petroleum business," 445 U. S., at

---

respect to dividends received by ASARCO from Lake Asbestos of Quebec, ASARCO International Corp., Hecla Mining Co., Kennecott Copper Co., Phelps-Dodge, and United Park City Mines. *American Smelting & Refining Co.* v. *Idaho State Tax Comm'n*, 99 Idaho 924, 935–937, 592 P. 2d 39, 50–52 (1979).

These rulings are not disputed here.

[11] See Rudolph, State Taxation of Interstate Business: The Unitary Business Concept and Affiliated Corporate Groups, 25 Tax L. Rev. 171, 181 (1970).

428, that included international petroleum exploration, production, refining, transportation, distribution, and sale of petroleum, as well as related chemical and mining enterprises. Much of its business abroad was conducted through wholly or partly owned subsidiaries. The State of Vermont imposed a corporate income tax on that portion of Mobil's total income that the State attributed to Mobil's Vermont activity, which was confined to the wholesale and retail marketing of petroleum. The State sought to include within Mobil's apportionable Vermont income its receipt of dividends from its subsidiaries and affiliates that operated abroad. Mobil protested that the State could not properly apportion and tax this "foreign source" dividend income.

For present purposes, our analysis in *Mobil* began with the observation that Mobil's principal dividend payors were part of Mobil's integrated petroleum business. Although Mobil was "unwilling to concede the legal conclusion" that activities by these dividend payors formed part of Mobil's " 'unitary business,' " it "offered no evidence that would undermine the conclusion that most, if not all, of its subsidiaries and affiliates contribute[d] to [Mobil's] worldwide petroleum enterprise." *Id.*, at 435.

The Court next stated that due process limitations on Vermont's attempted tax would be satisfied if there were "a 'minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Id.*, at 436–437, citing *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 272–273 (1978); *National Bellas Hess, Inc.* v. *Illinois Dept. of Revenue*, 386 U. S. 753, 756 (1967); *Norfolk & Western R. Co.* v. *Missouri Tax Comm'n*, 390 U. S. 317, 325 (1968). And we said that these limitations would not be contravened by state apportionment and taxation of income that were determined by geographic accounting to have arisen from a different State "so long as the intrastate and extrastate activities formed part of *a single unitary business.*" 445 U. S., at 438 (emphasis added).

The *Mobil* Court explicated the limiting "unitary business" principle by observing that geographic accounting, in purporting to isolate income received in various States, "may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale." *Ibid.* The fact that "these factors of profitability arise from the operation of the business as a whole," *ibid.*, therefore could justify a State's otherwise impermissible inclusion of corporate income derived from corporate activities beyond the State's borders. The Court thus stated:

> "[T]he linchpin of apportionability in the field of state income taxation is the unitary-business principle. In accord with this principle, what appellant must show, in order to establish that its dividend income is not subject to an apportioned tax in Vermont, is that the income was earned in the course of activities unrelated to the sale of petroleum products in that State. [Mobil] has made no effort to demonstrate that the foreign operations of its subsidiaries and affiliates are distinct in any business or economic sense from its petroleum sales activities in Vermont. Indeed, all indications in the record are to the contrary, since it appears that these foreign activities are part of [Mobil's] integrated petroleum enterprise. In the absence of any proof of *discrete business enterprise*, Vermont was entitled to conclude that the dividend income's foreign source did not destroy the requisite nexus with in-state activities." *Id.*, at 439–440 (emphasis added and footnote omitted).

We consequently rejected Mobil's constitutional challenge to Vermont's tax. In so doing, however, we cautioned that we did

> "not mean to suggest that *all* dividend income received by corporations operating in interstate commerce is necessarily taxable in each State where that corporation does business. Where the business activities of the dividend payor have *nothing to do* with the activities of the

recipient in the taxing State, *due process considerations might well preclude apportionability, because there would be no underlying unitary business.*" *Id.*, at 441–442 (emphasis added).

We soon had occasion to reiterate these principles. Three months after *Mobil*, we decided *Exxon Corp.* v. *Wisconsin Dept. of Revenue*, 447 U. S. 207 (1980). In *Exxon*, "a vertically integrated petroleum company," *id.*, at 210, explored for, produced, refined, and marketed petroleum and related products. Although Exxon's activities in Wisconsin were confined to marketing, the State sought to apportion and tax Exxon's income from nonmarketing activities in the United States.

Exxon disputed the propriety of this treatment. The Wisconsin Tax Appeals Commission agreed with the objection on the basis of its conclusion that Exxon's "three main functional operating departments—Exploration and Production, Refining, and Marketing—were *separate* unitary businesses." *Id.*, at 215 (emphasis added). The Commission found that the tax as applied " 'had the effect of imposing a tax on [Exxon's] exploration and on its refining net income, all of which was derived solely from operations outside the State of Wisconsin and which had no integral relationship to [Exxon's] marketing operations within Wisconsin.'" *Ibid.* On appeal, however, the Circuit Court for Dane County held that Exxon's three main functional operating departments were all part of a *single* unitary business. The Wisconsin Supreme Court agreed.[12]

---

[12] That court examined Exxon's organizational structure and business operations. It found that Exxon's full utilization of its production and refining functions were dependent on its marketing system, which encompassed Exxon's Wisconsin activities. The court therefore agreed with the Circuit Court for Dane County that Exxon's marketing in Wisconsin was an integral part of one unitary business and, consequently, that its total corporate income derived from the United States was subject to Wisconsin's apportioned taxation. See 447 U. S., at 217–219.

In reviewing the case, this Court unanimously agreed with the State Commission and the two state courts that the decisive concept in the case was that of a unitary business. Significantly, we repeated *Mobil's* teaching that "[t]he 'linchpin of apportionability' for state income taxation of an interstate enterprise is the 'unitary-business principle.'" *Id.*, at 223, quoting *Mobil*, 445 U. S., at 439. We also repeated:

> "In order to exclude certain income from the apportionment formula, the company must prove that 'the income was earned in the course of activities unrelated to the sale of petroleum products in that State.' . . . The court looks to the 'underlying economic realities of a unitary business,' and the income must derive from 'unrelated business activity' which constitutes a 'discrete business enterprise,' 445 U. S., at 441, 442, 439." 447 U. S., at 223–224.

Examining the facts, the Court found that Exxon was "a highly integrated business which benefits from an umbrella of centralized management and controlled interaction." *Id.*, at 224.[13] We rejected the company's protest because "[w]e agree[d] with the Wisconsin Supreme Court that Exxon [was] such a unitary business and that Exxon has not carried

_____

[13] It was noted that Exxon's Coordination and Services Management office "provided many essential corporate services for the entire company, including the coordination of the refining and other operational functions 'to obtain an optimum short range operating program.' . . . Many of the items sold by appellant in Wisconsin were obtained through a centralized purchasing office in Houston whose obvious purpose was to increase overall corporate profits through bulk purchases and efficient allocation of supplies among retailers. . . . Even the gasoline sold in Wisconsin was available only because of an exchange agreement with another company arranged by the Supply Department, part of Coordination and Services Management, and the Refining Department. Similarly, sales were facilitated through the use of a uniform credit card system, uniform packaging, brand names, and promotional displays, all run from the national headquarters." *Id.*, at 224.

its burden of showing that its functional departments are 'discrete business enterprises'. . . ."  *Ibid.*[14]

## III

In this case, ASARCO claims that it has succeeded, where the taxpayers in *Mobil* and *Exxon* failed, in proving that the dividend payors at issue are not part of its unitary business, but rather are "discrete business enterprises."  447 U. S., at 224.  We must test this contention on the record before us.

### A

The closest question is posed by ASARCO's receipt of dividends from Southern Peru.  ASARCO is one of Southern Peru's four shareholders, holding 51.5% of its stock.[15]

---

[14] The unitary-business principle applied in *Mobil* and *Exxon* is not new. It has been a familiar concept in our tax cases for over 60 years.  See *United States Steel Corp.* v. *Multistate Tax Comm'n*, 434 U. S., at 473, n. 25, 474, n. 26; *General Motors Corp.* v. *Washington*, 377 U. S. 436, 439 (1964); *Northwestern States Portland Cement Co.* v. *Minnesota*, 358 U. S. 450, 460 (1959); *Butler Bros.* v. *McColgan*, 315 U. S. 501, 508 (1942); *Ford Motor Co.* v. *Beauchamp*, 308 U. S. 331, 336 (1939); *Norfolk & Western R. Co.* v. *North Carolina ex rel. Maxwell*, 297 U. S. 682, 684 (1936); *Hans Rees' Sons, Inc.* v. *North Carolina ex rel. Maxwell*, 283 U. S. 123, 132–133 (1931); *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n*, 266 U. S. 271, 282 (1924).  Cf. *Burnet* v. *Aluminum Goods Mfg. Co.*, 287 U. S. 544, 550 (1933); *Underwood Typewriter Co.* v. *Chamberlain*, 254 U. S. 113, 120–121 (1920); *Wallace* v. *Hines*, 253 U. S. 66, 69 (1920); *Fargo* v. *Hart*, 193 U. S. 490, 499–500 (1904); *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194, 221–222 (1897); *Adams Express Co.* v. *Ohio State Auditor*, 166 U. S. 185, 219, 222, 223–224 (1897).

A review of our cases before *Mobil* made plain that "[f]ormulary apportionment, which takes into account the entire business income of a multistate business in determining the income taxable by a particular state, is constitutionally permissible only in the case of a unitary business." Rudolph, *supra* n. 11, at 183–184.

[15] The other shareholders are Phelps Dodge, 16%; Newmont Mining, 10.25%; and Cerro Corp., 22.25%.  App. 86a.  Either these large compa-

Southern Peru produces smelted but unrefined "blister cop-per" in Peru, and sells 20–30% of its output to the South-ern Peru Copper Sales Corp.[16] The remainder of Southern Peru's output is sold under contracts to its shareholders in proportion to their ownership interests. Southern Peru sold about 35% of its output to ASARCO, App. 89a, at prices de-termined by reference to average representative trade prices quoted in a trade publication and over which the parties had no control.[17] *Id.*, at 125a–126a; 99 Idaho, at 928, 592 P. 2d, at 43.

ASARCO's majority interest, if asserted, could enable it to control the management of Southern Peru. The Idaho State

---

nies or their parents were traded on the New York Stock Exchange at the time in question.

[16] Southern Peru Copper Sales Corp. in turn sells the copper to European customers. These European sales are handled in this manner to preserve Southern Peru's favorable federal tax status as a Western Hemisphere Trading Corporation.

Southern Peru Copper Sales Corp.'s stock is owned in the same manner as is Southern Peru's. Unlike Southern Peru, however, Southern Peru Copper Sales Corp. has no employees of its own. Sales are generally transacted by ASARCO's New York office, for which that office earns a sales commission. *Ibid.*

[17] These sales ranged between $44 and $65 million for the years in ques-tion. *Id.*, at 89a. There was evidence that ASARCO could replace this output contract "[w]ithin a short time" if it were lost, and that loss of ASARCO's ownership in Southern Peru would not cause the loss of the output contract. *Id.*, at 128a.

Southern Peru has a "staff that you'd expect a major corporation to have." *Id.*, at 122a. ASARCO provided Southern Peru with purchasing service outside of Peru, traffic service for its exports and imports outside of Peru, and preparation service for its United States tax return. *Id.*, at 123a–124a. The contract for ASARCO's purchasing services provided for payment of this service on the basis of a fixed fee plus a commission based on the dollar volume of purchases. *Id.*, at 124a. ASARCO received sepa-rate "negotiated fair fee[s]" for its tax and traffic services. *Ibid.* South-ern Peru has its own purchasing, traffic, and tax departments in Peru. *Id.*, at 123a.

Tax Commission, however, found that Southern Peru's "remaining three shareholders, owning the remainder of the stock, refuse[d] to participate in [Southern Peru] unless assured that they would have a way to assure that management would not be completely dominated by ASARCO." App. to Juris. Statement 55. Consequently ASARCO entered a management agreement giving it the right to appoint 6 of Southern Peru's 13 directors. The other three shareholders also appointed six directors. *Ibid.* The thirteenth and final director is appointed by the joint action of either the shareholders or the first 12 directors. *Ibid.;* App. 121a. Southern Peru's bylaws provide that eight votes are required to pass any resolution, *ibid.* and its articles and bylaws can be changed only by unanimous consent of the four stockholders.

In its unreported opinion, the state trial court concluded that this management contract "insures that [ASARCO] will not be able to control [Southern Peru]." App. to Juris. Statement 43a. It likewise found that Southern Peru "operates independently of [ASARCO]." *Id.*, at 42a. The court reached this conclusion after hearing testimony that ASARCO did not "control Southern Peru in any sense of that term," App. 121a, and that Southern Peru did not "seek direction or approval from ASARCO on major decisions." *Id.*, at 124a. Idaho does not dispute any of these facts. In view of the findings and the undisputed facts, we conclude that ASARCO's Idaho silver mining and Southern Peru's autonomous business are insufficiently connected to permit the two companies to be classified as a unitary business.

## B

Under the principles of our decisions, the relationship of each of the other four subsidiaries to ASARCO falls far short of bringing any of them within its unitary business. M. I. M. Holdings engages in the mining, milling, smelting, and refining of copper, lead, zinc, and silver in Australia. The company also operates a lead and zinc refinery in England. During the years in question M. I. M. sold only about 1%

of its output to ASARCO, for sums in the range of $0.2 to $2.2 million. *Id.*, at 43a–47a. It appears that these sales were on the open market at prevailing market rates. ASARCO owns 52.7% of M. I. M.'s stock, and the rest is widely held. Although ASARCO has the control potential to manage M. I. M., no claim is made that it has done so.[18] As an ASARCO executive explained, it never even elected a member of M. I. M.'s board:

> "This company has been very successful in staffing the corporation with Australian people and [they have] been able to run this company by themselves and, therefore, in consequence of the nationalistic feeling which develops in most of such developing countries we have not exercised any right we might have to elect a director to the board of the company." *Id.*, at 132a.

In addition to forgoing its right to elect directors, ASARCO similarly has taken no part in the selection of M. I. M.'s officers—a function of the board of directors. Nor do the two companies have any common directors or officers. *Id.*, at 34a, 40a. The state trial court found that M. I. M. "operates entirely independently of and has minimal contact with" ASARCO. App. to Juris. Statement 43a. As the business relation also is nominal, it is clear that M. I. M. is merely an investment. See, *e. g.*, Keesling & Warren, The Unitary Concept in the Allocation of Income, 12 Hastings L. J. 42, 52–53 (1960).

General Cable and Revere Copper, large publicly owned companies, fabricate metal products. Both are ASARCO customers.[19] But ASARCO held only minority interests, own-

---

[18] M. I. M. did use an ASARCO melting furnace patent for which it pays a price "the same that would be paid by any other company using it." *Id.*, at 133a.

[19] For the years in question, Revere's purchases averaged 3–4% of ASARCO's sales and totalled from $17 to $29 million. *Id.*, at 27a. Revere in turn sold ASARCO from 1 to 2% of its total output, which totalled $4–$6 million. *Id.*, at 43a–47a. General Cable's purchases accounted for

ing approximately 34% of the outstanding common shares of each. The remaining shares—listed on the New York Stock Exchange—are widely held. App. 135a. The two companies occupy parallel positions with respect to ASARCO as a result of a 1961 Department of Justice antitrust suit against ASARCO. The suit was based on ASARCO's interests in each. In 1967, ASARCO consented to a decree that prohibited it from maintaining common officers in these companies, voting its stock in them, selling the companies copper at prices below those quoted to their competition, and from acquiring stock in any other copper fabricator. *Id.*, at 96a. Neither Revere's nor General Cable's management seeks direction or approval from ASARCO on operational or other management decisions.[20] *Id.*, at 137a.

Mexicana mines and smelts lead and copper in Mexico. Originally it was a wholly owned subsidiary of ASARCO, but a change in Mexican law required ASARCO to divest itself of 51% of Mexicana's stock in 1965. This stock is now publicly held by Mexican nationals. The record does not reveal whether ASARCO and Mexicana have any common directors. The state trial court found, however, that Mexicana "operates independently of [ASARCO]," App. to Juris. Statement 43a, and the Idaho Supreme Court stated that "Mexicana does not seek approval from ASARCO concerning major policy decisions . . . ." 99 Idaho, at 929, 592 P. 2d, at 44.[21]

---

approximately 6% of ASARCO's sales and ranged from $31 to $47 million. *Id.*, at 27a. ASARCO's purchases from General Cable averaged 0.1% of General Cable's total sales and ranged between $0.3 and $0.5 million. *Id.*, at 43a–47a.

[20] Both Revere and General Cable utilized ASARCO's stock transfer department on a contract basis, and Revere licensed one patent from ASARCO for a "fair price." *Id.*, at 136a.

In 1970, ASARCO was compelled, apparently by the Department of Justice, to divest itself of all its General Cable stock. *Id.*, at 95a.

[21] ASARCO sold Mexicana none of its output in 1968 and insignificant amounts (totalling $24,169 and $14,902) in 1969 and 1970. *Id.*, at 27a. Mexicana apparently did not sell ASARCO any of its output during the

## C

Idaho does not dispute the foregoing facts. Neither does it question that a unitary business relationship between ASARCO and these subsidiaries is a necessary prerequisite to its taxation of the dividends at issue. *E. g.*, Brief for Appellee 10 ("When income is earned from activities which are part of a unitary business conducted in several states, then the requirement that the income bear relation to the benefits and privileges conferred by the several states has been met"). See also Tr. of Oral Arg. 25 ("[W]hen intangible assets such as, for example, shares of stock, are found to be a part of a taxpayer's own unitary business, . . . there is no logical or constitutional reason why the income from those same intangibles should be treated any differently than any other business income that that taxpayer might earn"). Rather the State urges that we expand the concept of a "unitary business" to cover the facts of this case.

time in question. *Id.*, at 43a–47a. For a commission, ASARCO does act as a contract sales agent for Mexicana in the United States. *Id.*, at 131a. This contract would continue if ASARCO lost its investment interest in Mexicana. *Ibid.* ASARCO also provides technical services to Mexicana for a fee. *Id.*, at 130a; 99 Idaho, at 929, 592 P. 2d, at 44.

The dissent's perception of some of the facts differs substantially from the record. It speculates that ASARCO's unitary-business experience "must" have aided ASARCO's stock investments, *post*, at 336, despite the undisputed trial court finding that ASARCO's stock investments were "not integral to nor a necessary part of [ASARCO's] business operation . . . ." App. to Juris. Statement 44a. See also *id.*, at 43a. It maintains that— "[f]or all we know"—ASARCO's stock investments were interim uses of idle funds "accumulated for the future operation of [ASARCO's] own primary business." *Post*, at 337. The trial court, however, found that ASARCO "has never been required to utilize its stock as security for borrowing of working capital, acquiring stock or securities in other companies or to support any bond issues." App. to Juris. Statement 41a. Moreover, ASARCO was found to have "sufficient cash flow from mining to provide operating capital for all mining operations without reliance upon cash flow from . . . income from intangibles." *Ibid.*

The dissent also describes the five companies as "captive suppliers and customers . . . ." *Post*, at 342. This description is at odds with the undisputed facts. See *supra*, at 320–324.

Idaho's proposal is that corporate *purpose* should define unitary business. It argues that intangible income should be considered a part of a unitary business if the intangible property (the shares of stock) is "acquired, managed or disposed of for purposes relating or contributing to the taxpayer's business." Brief for Appellee 4. See also Tr. of Oral Arg. 25 (urging that income from intangible property be considered part of a unitary business when the intangibles "contribute to or relate to or are some way in furtherance of the taxpayer's own trade or business"). Idaho asserts that "[i]t is this integration—i. e., between the business use of the intangible asset (the shares of stock) and ASARCO's mining, smelting, and refining business—which makes the income part of the unitary business." Brief for Appellee 4.

This definition of unitary business would destroy the concept. The business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently *all* of its operations, including any investment made, in some sense can be said to be "for purposes related to or contributing to the [corporation's] business." When pressed to its logical limit, this conception of the "unitary business" limitation becomes no limitation at all. When less ambitious interpretations are employed, the result is simply arbitrary.[22]

---

[22] Cf. Keesling & Warren, California's Uniform Division of Income for Tax Purposes Act, Part I, 15 UCLA L. Rev. 156, 172 (1967).

Such arbitrariness is evident in this case. As previously noted, see n. 10, *supra*, ASARCO received dividend income from Lake Asbestos of Quebec. Lake Asbestos is a wholly owned subsidiary of ASARCO that is engaged in extracting and processing asbestos fibers in Canada. App. 86a. Its selling agent is ASARCO International, another wholly owned ASARCO subsidiary. *Ibid.* The Idaho Supreme Court found that "Lake Asbestos has its own staff, but ASARCO provides important management services. Lake Asbestos seeks ASARCO's direction and approval on major policy decisions." 99 Idaho, at 929, 592 P. 2d, at 44.

Lake Asbestos consequently appears in many respects to be more likely to qualify as part of ASARCO's unitary business than does any of the five

We cannot accept, consistently with recognized due process standards, a definition of "unitary business" that would permit nondomiciliary States to apportion and tax dividends "[w]here the business activities of the dividend payor have nothing to do with the activities of the recipient in the taxing State . . . ."[23]  *Mobil Oil Corp.* v. *Commissioner of Taxes of*

corporations involved in this case.  Yet Idaho now agrees, as the courts below held, that on this record Lake Asbestos is *not* part of such a business.  See Tr. of Oral Arg. 39.

ASARCO also received approximately $250,000 a year in dividends from Kennecott Copper Corp., and approximately $300,000 a year in dividends from Phelps Dodge.  App. 52a.  The record describes the business of these two corporations as the mining, smelting, refining, and sale of copper.  *Id.*, at 50a.  ASARCO made sales in the range of $3–$5 million a year to Kennecott, and $24,000–$800,000 a year to Phelps Dodge.  *Id.*, at 27a.  Each in turn made some (albeit "minimal") sales to ASARCO.  *Id.*, at 43a–47a.

In light of this information, we have no basis for concluding that ASARCO did *not* "acquire" stock in Kennecott and Phelps Dodge "for purposes relating or contributing to the taxpayer's business."  Brief for Appellee 4.  ASARCO's management scarcely would make such an admission.  Yet Idaho makes no claim that Kennecott and Phelps Dodge are part of ASARCO's unitary business.

JUSTICE O'CONNOR's dissent views the Court's decision as "prohibiting apportioned taxation of investment income by nondomiciliary states." *Post*, at 345 *et seq.*  This reflects a serious misunderstanding of our decision today and the cases on which we rely.  The case we follow primarily is *Mobil.*  It sustained the taxation of investment income after applying enunciated principles carefully to the facts of the case.  In this case we have applied the same principles but have reached a different result because the facts differ in critical respects.  As we have said elsewhere, the application of the unitary-business principle requires in each case a careful examination both of the way in which the corporate enterprise is structured and operates, and of the relationship with the taxing State.

[23] The dissent, argues that our reliance on the Due Process Clause is inappropriate.  It also says that our holding that Idaho has exceeded its jurisdiction to tax somehow "strip[s] Congress of the authority" to authorize or regulate state taxation.  *Post*, at 331.  See also *post*, at 349–350, 353.  In analyzing the validity of Idaho's tax, we follow long-established precedent in relying on the Due Process Clause of the Fourteenth Amendment.  See,

*Vermont,* 445 U. S., at 442. In such a situation, it is not true that "the state has given anything for which it can ask return." *Wisconsin* v. *J. C. Penney Co.,* 311 U. S., at 444.

Justice Holmes stated long ago that "the possession of bonds secured by mortgages of lands in other States, or of a land-grant in another State or of other property that adds to the riches of the corporation but does not affect the [taxing State's] part of the [business] is no sufficient ground for the increase of the tax—whatever it may be . . . ." *Wallace* v. *Hines,* 253 U. S. 66, 69–70 (1920). In this case, it is plain that the five dividend-paying subsidiaries "add to the riches" of ASARCO. But it is also true that they are "discrete business enterprise[s]" that—in "any business or economic sense"—have "nothing to do with the activities" of ASARCO in Idaho. *Mobil, supra,* at 439–442. Therefore there is no "rational relationship between the [ASARCO dividend] income attributed to the State and the intrastate values of the enterprise. *Moorman Mfg. Co.* v. *Bair,* 437 U. S. 267, 272–273 (1978)." *Mobil, supra,* at 437. Idaho's attempt to tax a portion of these dividends can be viewed as "a mere effort to reach profits earned elsewhere under the guise of legitimate taxation." *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n,* 266 U. S. 271, 283 (1924). The Due Process Clause bars such an effort to levy upon income that is

---

*e. g., Exxon,* 447 U. S., at 219, 221–225, 226, 227; *Mobil,* 445 U. S., at 436–442; *Butler Bros.* v. *McColgan,* 315 U. S., at 507, 508; *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S., at 120–121. In view of our decision on due process, it is unnecessary to address appellant's Commerce Clause argument. In any event, it is elementary that the "States . . . are subject to limitations on their taxation powers that do not apply to the Federal Government." *F. W. Woolworth Co.* v. *Taxation & Revenue Dept., post,* at 363. Cf. *Insurance Corp. of Ireland, Ltd.* v. *Compagnie des Bauxites de Guinee,* 456 U. S. 694, 713 (1982) (POWELL, J., concurring in judgment). The question of federal authority to legislate in this area—whether to lay taxes or to delegate such power—is not presented in this case, and we imply no view as to it.

not properly "within the reach of [Idaho's] taxing power." *Connecticut General Life Ins. Co.* v. *Johnson*, 303 U. S., at 80.[24]

## IV

In addition to the disputed dividend income, Idaho also has sought to tax certain ASARCO interest and capital gains in-

---

[24] The dissenting opinion reflects profound—though unexpressed—dissatisfaction with the unitary-business principle, even though it was firmly established by more than a half a dozen decisions of this Court prior to *Mobil* and *Exxon*. See n. 14, *supra*. The dissent purports to rely on these recent cases, and yet its basic arguments—in practical effect—would seriously undermine their force as precedents. It relies primarily on considerations quite different from those identified as controlling in *Mobil* and *Exxon*. The dissent does not deny that ASARCO's subsidiaries were discrete business enterprises; rather it submits that they were engaged "in the same general line of business." *Post*, at 335. It notes—though the relevance is not obvious—that the management of ASARCO had special knowledge of the types of business engaged in by these subsidiaries. *Post*, at 336–337. The dissent also perceives a relationship between Idaho and the investment income simply because ASARCO has the use in its business of income from whatever source it may be derived. *Post*, at 337–339. Finally, it emphasizes the limited amount of open market buying and selling of products between ASARCO and the companies in which it has invested funds. See Parts III–A and III–B, *supra*.

In *Mobil*, in applying the unitary-business principle, the Court stated that the question is whether "the [investment] income was earned in the course of activities unrelated to the sale of petroleum products" in the State seeking to tax the income. Our decision went against Mobil Oil Corp. because we found that its "foreign activities [were] part of appellant's integrated petroleum enterprise," and because the subsidiaries in question were not shown to operate as "discrete business enterprise[s]." 445 U. S., at 439. In this case, in sharp contrast, the record establishes that each of the three partial subsidiaries in question operated a "discrete business enterprise" having "nothing to do with the activities of [ASARCO] in the taxing State." *Id.*, at 442.

As we recognize in this opinion, these cases are decided on their facts in light of established general principles. The most comprehensive discussion of the factors that are relevant is contained in our recent decisions in *Mobil* and *Exxon*. In both of those cases, that we follow today, the States

come. The interest income arose from a note ASARCO received from its sale of Mexicana stock and from a Revere convertible debenture, as well as in connection with ASARCO's 1970 disposition of its General Cable stock. See n. 21, *supra*. The General Cable stock sale also generated capital gains for ASARCO, as did ASARCO's sale of a portion of its stock in M. I. M.

Idaho and ASARCO agree that interest and capital gains income derived from these companies should be treated in the same manner as the dividend income.[25] Brief for Appellant 27; Brief for Appellee 21. Cf. 99 Idaho, at 937, 592 P. 2d, at 52 ("In our view the same standard applies to the question whether gains from the sale of stock are business income as applies to the question whether dividends from the stock are business income"). We also agree. "One must look principally at the underlying activity, not at the form of investment, to determine the propriety of apportionability." *Mobil*, 445 U. S., at 440. Changing the form of the income "works no change in the underlying economic realities of [whether] a unitary business [exists], and accordingly it ought not to affect the apportionability of income the parent receives." *Id.*, at 441. We therefore hold that Idaho's attempt to tax this income also violated the Due Process Clause.

## V

For the reasons stated, the judgment of the Supreme Court of Idaho is

*Reversed.*

---

prevailed because it was clear that the corporations operated unitary businesses with a continuous flow and interchange of common products. ASARCO has proved that these essential factors are wholly absent in this case. It is late in the day to confuse this important area of state tax law by rewriting the standards of *Mobil* and *Exxon*.

[25] ASARCO has not challenged Idaho's taxation of interest and capital gains income other than that attributable to the five corporations discussed in the text. Brief for Appellant 26. We do not intimate views on such matters.

CHIEF JUSTICE BURGER, concurring.*

I join the Court's opinions in both No. 80–2015 and No. 80–1745 in reliance on the Court's express statement that the Court's holdings do not preclude future congressional action in this area.. *Ante,* at 328, n. 23.

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN and JUSTICE REHNQUIST join, dissenting.

The Court today declares that the Due Process Clause of the Constitution forbids a State to tax a proportionate share of the investment income of a nondomiciliary corporation doing business within its borders. In so doing, the Court groundlessly strikes down the eminently reasonable assertion of Idaho's taxing power at issue in this case. Far more dismaying, however, is that the Court's reliance on the Due Process Clause may deprive Congress of the authority necessary to rationalize the joint taxation of interstate commerce by the 50 States.

Today, the taxpayer wins. Yet in the end, today's decision may prove to be a loss for all concerned—interstate businesses themselves, which the Commerce Clause guarantees the opportunity to serve the country's needs unimpeded by a parochial hodgepodge of overlapping and conflicting tax levies; the Nation, which demands a prosperous interstate market; and the States, which deserve fair return for the advantages they afford interstate enterprise. For while this Court has the authority to invalidate a specific state tax, only Congress has both the ability to canvass the myriad facts and factors relevant to interstate taxation and the power to shape a nationwide system that would guarantee the States fair revenues and offer interstate businesses freedom from strangulation by multiple paperwork and tax burdens. Unfortunately, by apparently stripping Congress of the authority to do the job, the Court delays the day when a uniform system responsive to the needs of all can be fashioned.

---

*[This opinion applies also to No. 80–1745, *F. W. Woolworth Co.* v. *Taxation and Revenue Department of New Mexico, post,* p. 354.]

The Court has strayed "beyond the extremely limited restrictions that the Constitution places" on the taxing power of the States, "inject[ed itself] in a merely negative way into the delicate processes of fiscal policy-making," and regrettably "imprison[ed] the taxing power of the states within formulas that are not compelled by the Constitution." *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 445 (1940). I respectfully dissent.

## I

"Taxes," as Justice Holmes once observed, "are what we pay for civilized society." *Compania General de Tabacos de Filipinas* v. *Collector of Internal Revenue*, 275 U. S. 87, 100 (1927) (dissenting opinion). A natural corollary of this proposition is that the Due Process Clause permits state taxation if "the state has given anything for which it can ask return." *Wisconsin* v. *J. C. Penney Co.*, 311 U. S., at 444. A State thus "is free to pursue its own fiscal policies, unembarrassed by the Constitution," if it "exert[s] its power in relation to opportunities which it has given, to protection which it has afforded, [or] to benefits which it has conferred by the fact of being an orderly, civilized society." *Ibid.*

In applying this fundamental principle to businesses that derive income from more than one State, we repeatedly have declared that a state tax passes constitutional muster unless the taxpayer can show that there is not even "a 'minimal connection' between [its] interstate activities and the taxing State," or a merely "rational relationship between the income attributed to the State and the intrastate values of [its] enterprise." *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont*, 445 U. S. 425, 436–437 (1980) (quoting *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 272–273 (1978)). As the present case demonstrates, however, this oft-repeated formula is more easily stated than applied when a State attempts to tax the net income of an enterprise doing business in many jurisdictions.

The principal difficulty arises because a multijurisdictional business is "an organic system," *Wallace* v. *Hines*, 253 U. S.

66, 69 (1920) (Holmes, J.), whose income cannot sensibly be reduced to the sum of the hypothetical incomes of distinct component parts, each wrenched from the unitary whole and conceptually confined to operations within a single State.[1] With this understanding in mind, for more than half a century we have held that a State is not constitutionally required to tax only that slice of an interstate enterprise operating physically within the State. See, e. g., *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n,* 266 U. S. 271 (1924); *Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S. 207 (1980). Instead, as we stated only two Terms ago, "[i]t has long been settled that 'the entire net income of a corporation, generated by interstate as well as intrastate activities, may be fairly apportioned among the States for tax purposes by formulas utilizing in-state aspects of interstate affairs,'" *id.,* at 219 (quoting *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 460 (1959)), provided only that in each case the resulting tax liability is not "'out of all appropriate proportion to the business transacted'" in the taxing

---

[1] For example, if the expenses incurred by a vertically integrated business in manufacturing a product in State A are deducted from the revenues generated by marketing the product in State B, the resulting net income cannot reasonably be allocated either entirely to State A or entirely to State B. See *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, 120–121 (1920). Even when state-by-state allocation superficially seems feasible, as in the case of a horizontally integrated, but loosely knit chain of retail stores, "economies of scale" resulting from "functional integration" and "centralization of management," *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont,* 445 U. S. 425, 438 (1980), may augment the net income earned by the whole to a value greater than the sum of what could be earned by each of the parts operating separately. See *Butler Bros.* v. *McColgan,* 315 U. S. 501, 508–509 (1942). When this happens, the additional increment in income resulting from the combination cannot be allocated to any single one of the parts on other than an arbitrary basis. See, e. g., *Adams Express Co.* v. *Ohio State Auditor,* 165 U. S. 194, 221 (1897) (a unitary enterprise has a "value resulting from the combination of the means by which the business [is] carried on [which] exist[s] . . . throughout the entire domain of [its] operation"). The net income of an organic, unitary business, in short, is indivisible.

State itself, 447 U. S., at 220 (quoting *Hans Rees' Sons, Inc.* v. *North Carolina ex rel. Maxwell*, 283 U. S. 123, 135 (1931)).

In short, the "linchpin" of apportioned state taxation is the concept of an organic, unitary business. *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont, supra,* at 439. The constitutionality of a state tax levied on extraterritorial business operations thus turns on whether the out-of-state business activity can be characterized as a separate business with no in-state contacts or whether instead it is a part of a unitary enterprise doing business in the State. In the case before us, the Court first errs when it attempts to determine whether or not ASARCO's investments were part of ASARCO's unitary nonferrous metals business.

## II

ASARCO realized capital gains, dividends, and interest income from its ownership of securities issued by five foreign subsidiaries. The issue for the Court is whether that income was earned by ASARCO's unitary nonferrous metals business, and therefore was subject to Idaho's taxes, or instead was earned by a separate investment business unrelated to ASARCO's operations in Idaho, and therefore was constitutionally exempt from taxation by that State. As always, of course, the State's taxation of the company's income is presumptively constitutional. To overcome that presumption, ASARCO has the "'distinct burden of showing by "clear and cogent evidence"'" that Idaho's scheme "'results in extraterritorial values being taxed.'" *Exxon Corp.* v. *Wisconsin Dept. of Revenue, supra,* at 221 (quoting *Butler Bros.* v. *McColgan*, 315 U. S. 501, 507 (1942), in turn quoting *Norfolk & Western R. Co.* v. *North Carolina ex rel. Maxwell*, 297 U. S. 682, 688 (1936)).

According to the Court, ASARCO has met this burden by showing that during the relevant tax years its holdings in the five subsidiaries were passive investments not functionally

integrated with ASARCO's nonferrous metals business. On this basis, the Court concludes that ASARCO's holdings were, in effect, part of a separate investment business having too little to do with ASARCO's unitary nonferrous metals business to support apportioned taxation.

Both common sense and business reality dictate a different result. ASARCO, far from showing that its investment holdings were part of an "unrelated,"[2] "discrete business enterprise,"[3] "hav[ing] nothing to do with the activities"[4] of its unitary nonferrous metals business, has failed in at least three ways to bear its "distinct burden" of demonstrating that Idaho's tax was unconstitutionally levied.

## A

First, even accepting, *arguendo*, the Court's conclusion that the contested income was derived from passive investments, ASARCO has failed to show that its investment decisionmaking was segregated from its nonferrous metals business. ASARCO cannot deny that the subsidiary companies in which it invested were participants in the nonferrous metals industry, the very industry in which ASARCO played a major operational role. As the Court acknowledges, ASARCO "mine[d], smelt[ed], and refine[d] . . . nonferrous metals such as copper, gold, silver, lead, and zinc," *ante*, at 309, while one of its subsidiaries "engaged in the mining, milling, smelting, and refining of nonferrous metals," *ante*, at 309, n. 2, another engaged "in the same general line of business" as did "ASARCO in the United States," *ibid.*, a third "mine[d] and smelt[ed] copper," *ante*, at 309–310, n. 2, and the last two were important "ASARCO customers," *ante*, at 323, fabricating, respectively, cables and copper wares, *ante*, at 309, n. 2. In short, ASARCO invested not in "unrelated business[es]," such as hotel chains and breweries, but in

---

[2] *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont, supra,* at 439.

[3] *Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S. 207, 224 (1980).

[4] *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont, supra,* at 442.

companies participating in the nonferrous metals markets. *Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S., at 224 (quoting *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont,* 445 U. S., at 442).

ASARCO invested in these nonferrous metals companies with a well-founded confidence that few other investors could muster, since much of what it had learned in operating its own nonferrous metals business must have been invaluable in evaluating the prospects for other companies engaged in similar businesses and markets worldwide. Put another way, it would have been a perverse act of self-denial for ASARCO to ignore its intimate knowledge of world markets, refining and smelting technology, mining operations, and geological reserves when it decided whether and how to invest in the five companies of concern here. Thus, the investment decisions ASARCO made regarding the securities of these five participants in the nonferrous metals markets undoubtedly depended heavily on ASARCO's knowledge of its own business.

In fact, during the course of this litigation, ASARCO has admitted as much. In the trial court, ASARCO's vice president and comptroller answered questions put to him by ASARCO's counsel as follows:

"Q. Now, ASARCO has investments in a lot of mining companies, does it not?

"A. Yes.

"Q. Can you tell the court why ASARCO makes investments of this nature?

"A. The ASARCO management utilizes its expertizes *[sic]* in channeling funds into these areas where they are knowledgeable and—most knowledgeable—and hopefully accrue *[sic]* to the benefit of ASARCO stockholders.

"Q. So that essentially ASARCO feels that it can use its expertizes *[sic]* to produce the maximum returns for its shareholders?

"A. That is correct.

"Q. And whereas with other purchases I suppose ASARCO feels that the shareholders can make the investments themselves as well as ASARCO can?

"A. Right." Record 81–82.

Moreover, in its brief to the Supreme Court of Idaho ASARCO flatly stated that "[i]t invests its shareholders' money in businesses in which it has expertise and distributes the investment return in the form of dividends to its shareholders." *Id.*, at 521.

In sum, far from showing by "clear and cogent evidence" that its investment decisions regarding other nonferrous metal suppliers and users were segregated from the resources of information and expertise developed in its own nonferrous metals business, ASARCO itself provided evidence that its investment decisionmaking was part of an indivisible, unitary nonferrous metals business. This alone warrants affirming the Idaho Supreme Court's due process ruling.

## B

Second, again assuming, *arguendo*, that the contested investments were in fact passive, ASARCO has failed to show that its holdings were divorced from its management of the financial requirements of its nonferrous metals business. For all we know, ASARCO's investments were triggered by its need to obtain a return on idle financial resources accumulated for the future operation of its own primary business.

ASARCO does not, and could not, contend that all its investment income is *per se* beyond the taxing power of the nondomiciliary States in which it operates. Rather, it concedes that the Due Process Clause permits Idaho to tax, on an apportioned basis, the income ASARCO earned on short-term investments of its working capital.[5] After all, an ap-

---

[5] ASARCO states that it "has not contested Idaho's right to treat interest income from temporary deposits of [its] working capital funds as

propriate amount of liquid working capital is necessary to the day-to-day operation of a business, and any return earned from its temporary investment is a byproduct of the operation of the business. ASARCO thus admits that Idaho could tax a portion of the income realized from an investment in, say, short-term commercial paper, even though the underlying operations of the issuing companies were far less related to ASARCO's nonferrous metals business than the operations of the five subsidiaries at issue here.

The interim investment of retained earnings prior to their commitment to a major corporate project, however, merely recapitulates on a grander scale the short-term investment of working capital prior to its commitment to the daily financial needs of the company. Just as companies prefer to maintain a cushion of working capital rather than resort to the short-term capital markets on an hourly basis for the money necessary to operate their businesses, many enterprises prefer to acquire the capital necessary for the expansion and replacement of plants and equipment by creating long-term funds, rather than resort to the vagaries of the capital markets. In order to prevent the accumulating capital from sitting idle, such funds are usually invested in financial assets with a degree of liquidity appropriate to the money's intended ultimate use.[6] Any return ASARCO earned on such investments

---

apportionable business income derived in the ordinary course of [its] Unitary Business activities." Brief for Appellant 26. See also Tr. of Oral Arg. 6–7.

[6] This process is analogous to the leasing of idle physical assets until they are needed in the business. By analogy to ASARCO's investment of its working capital in short-term securities, for example, a company might lease time on one of its computers to outsiders on an hourly basis in order to keep the computer fully occupied during slack periods. Similarly, in analogy to the interim investment of retained earnings, a company might lease for a term of years the areas of its office buildings into which it intends ultimately to expand. It could hardly be claimed that by so doing the company had opened up a separate and unrelated leasing business. To

plainly would be functionally related to the conduct of its non-ferrous metals business and, therefore, taxable by Idaho on an apportioned basis as unitary business income.

Such investment of idle funds, after all, mirrors the borrowing of funds a company lacks. Undoubtedly, ASARCO would be quick to assert that any long-term borrowing recorded on the liability side of its balance sheet is an integral part of its unitary business justifying the deduction of interest expense in the computation of apportionable net income. If so, ASARCO cannot contend that the long-term investments recorded on the asset side of its balance sheet are automatically separate from its unitary business, thereby justifying the exclusion of the revenues received from apportionable net income. The same principles apply whether the money is going in or coming out.

Thus, because investments of ASARCO's working capital are functionally integrated with its unitary nonferrous metals business, and because ASARCO failed to show by "clear and cogent evidence" the facts necessary to distinguish, on a principled basis, its investments in the securities of the five subsidiaries at issue here,[7] the Idaho Supreme Court correctly concluded that apportioned taxation of ASARCO's contested investment income does not violate the Due Process Clause.

---

the contrary, the income from such leases would be functionally related to the company's unitary business and, therefore, taxable on an apportioned basis by a State in which the company did business. Accordingly, it is hard to see why a company that rents out idle money rather than idle physical assets should be treated differently under the Due Process Clause, and harder still to see why the Constitution would treat short-term investments of working capital differently than longer-term investments of retained earnings.

[7] Of course, had ASARCO attempted to do so, it might have been able to make such a showing. ASARCO did argue, and the trial court found, that it had "never been required to utilize its stock as security for borrowing of working capital, acquiring stock or securities in other companies or to support any bond issues." Record 326.

## C

Finally, the Court errs even in its fundamental determination that ASARCO's holdings were passive investments unrelated to ASARCO's operational business. In fact, the disputed investments actively contributed to ASARCO's non-ferrous metals business.

To begin with, ASARCO had effective operational control of at least three of the five subsidiaries. ASARCO's commanding 52.7% interest in M. I. M. Holdings, Ltd., uncontestably gave it full control of that company. Although ASARCO did not wield quite the same power over Southern Peru Copper, its 51.5% interest nonetheless gave it unilateral veto power over all corporate decisions, including those supported unanimously by all other shareholders.[8] Finally, in the case of ASARCO Mexicana, the record discloses only that ASARCO had been forced to sell 51% of its initial 100% interest to Mexican nationals, retaining a 49% interest for itself. ASARCO has made no showing that it is not the principal investor in Mexicana and thus able to control the company. In sum, ASARCO undoubtedly was the dominant factor in at least three of the five subsidiaries under consideration here, with the power to use them to advantage in its nonferrous metals business.[9] The Court, however, minimizes the sig-

---

[8] Under the management agreement between ASARCO and the other three shareholders of Southern Peru, ASARCO has the right to appoint 6 of the company's 13 directors, the other three shareholders together have the right to appoint another 6, and the 13th and final director is appointed by the first 12 directors or by joint action of all the shareholders. Southern Peru's bylaws, which can be changed only by unanimous consent, provide that eight votes are needed to pass any resolution. App. to Juris. Statement 55a; App. 121a.

[9] ASARCO also dominated Revere Copper and General Cable. While ASARCO owned only 34% interests in each company, the remaining shares of each were "widely held," *ante*, at 324, so that ordinarily ASARCO would be assured control of each company and almost never face effective opposition to its wishes.

Prior to the tax years in question, however, the Justice Department brought an antitrust suit against ASARCO related to its holdings in Gen-

nificance of this control, emphasizing that ASARCO did not openly and aggressively assert its control during the tax years in question and concluding that ASARCO's subsidiaries did not contribute to its nonferrous metals business.

The Court's result is hard to understand in view of our decision just two years ago in *Exxon Corp.* v. *Wisconsin Dept. of Revenue.* In summarizing our result in *Exxon,* we asserted that the "important link" establishing the unity of

---

eral Cable and Revere Copper. The suit culminated in a consent decree issued in 1967 forbidding ASARCO to sell to General Cable and Revere Copper at prices lower than ASARCO sold to other customers and preventing ASARCO from voting its stock in either company. In 1970, the last of the three tax years at issue here, the decree was modified and "ASARCO was compelled . . . to divest itself of all its General Cable stock." *Ante,* at 324, n. 20.

ASARCO argues that the 1967 consent decree, which was issued before the tax years of concern here, prevented General Cable and Revere Copper from being a part of ASARCO's unitary business. To the contrary, however, the antitrust suit and consent decree strongly suggest that General Cable and Revere Copper were entangled in ASARCO's unitary business, perhaps unlawfully so. On the present record, ASARCO has not borne the burden of showing that the 1967 decree severed enough of the connections between ASARCO and the two subsidiaries to transform ASARCO's holdings from active components of its unitary business to passive investments. At least with respect to General Cable, the modification in 1970 (the last tax year in issue here) of the consent decree so that ASARCO was required to sell its holdings in the company indicates the contrary, since divestiture would scarcely be necessary if the business of the two companies had been unrelated. Moreover, the mere fact that ASARCO traded with General Cable and Revere Copper at market rates does not compel the conclusion that ASARCO's investments in those companies were part of its unitary business. In *Exxon,* for example, we concluded that the fact that "wholesale market values" were assigned "to interdepartmental transfers of products and supplies," 447 U. S., at 225, did not undermine the unitary nature of Exxon's business.

Although I believe that ASARCO's showing was insufficient to establish that General Cable and Revere Copper were not under its control for purposes of determining the constitutional limits of Idaho's taxation, for simplicity in what follows I assume only that ASARCO was a major investor in these two subsidiaries.

Exxon's business "most clearly" was based on two factors. 447 U. S., at 224.

First, we noted that "'placing individual segments under one corporate entity . . . provide[s] greater profits stability'" because "'nonparallel and nonmutual economic factors which may affect one department may be offset by the factors existing in another department.'" *Id.*, at 225 (quoting the testimony of an Exxon senior vice president). ASARCO's ownership of subsidiaries doing business in precisely ASARCO's line of work in two different geographical markets, M. I. M. Holdings in Australia and ASARCO Mexicana in Mexico, undoubtedly provided exactly that sort of advantage; economic conditions in Australia and Mexico do not track those in the United States, so that when the nonferrous metals business is in the doldrums in one country, it may be prospering in another. But, unlike the *Exxon* Court, today's Court is blind to the significance to the "profits stability" of ASARCO's nonferrous metals business of its subsidiaries in unrelated geographical markets.

Second, in *Exxon* we noted that the vertical relationship between the various departments in Exxon's business provided both "an assured supply of raw materials" and an "assured and stable outlet for products" so that Exxon could "minimiz[e]" the "risk of disruptions" "due to [the] supply and demand imbalances that may occur from time to time." *Ibid.* The *Exxon* Court's recognition of the business importance of captive suppliers and customers merely confirmed our earlier decision in *Mobil Oil*, in which we affirmed Vermont's apportioned taxation of the more than $115 million in dividend income Mobil had received from its 10% interest in the Arabian American Oil Co. 445 U. S., at 457, n. 10 (STEVENS, J., dissenting). Mobil's 10% investment, apart from providing handsome dividends, apparently had helped to assure Mobil of supplies of crude oil for its petroleum business. By contrast, the Court today inexplicably invalidates Idaho's taxation of ASARCO's dividend income from its fivefold

greater 51.5% interest in Southern Peru Copper Corp., an investment that evidently helped to assure ASARCO of supplies of unrefined copper, since 35% of the entire copper output of Southern Peru was sold to ASARCO.[10]

Apparently, the Court no longer believes it significant that the subsidiaries in which a parent has major holdings "minimiz[e]" the "risk of disruptions" "due to [the] supply and demand imbalances that may occur from time to time," *Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S., at 225, by providing "assured suppl[ies]" and "stable outlet[s]," *ibid.,* unless the subsidiaries are actively managed on a day-to-day basis. The Court evidently would find that ASARCO's subsidiaries were part of ASARCO's unitary business only if ASARCO experienced a "supply and demand imbalanc[e]" sufficiently severe to force it to exercise day-to-day control of its captive subsidiaries. In this regard, the Court's position is akin to the view that a paid-up fire insurance policy is a worthless asset unless smoke is in the air.

In sum, despite ASARCO's failure on each of the three counts just discussed to bear its "distinct burden" of showing that its investments are unrelated to its nonferrous metals business, the Court rules that Idaho cannot tax the investment income at issue here. In so doing, the Court unwisely substitutes for the multifaceted analysis used to determine whether the businesses in *Mobil Oil* and *Exxon* were unitary the oversimplified test of active operational control. The result is that the Court has ignored business advantages to ASARCO more than sufficient to establish that its holdings in its subsidiaries were part of its unitary business. In consequence, the Court wrongly concludes that ASARCO has borne the "distinct burden" of showing that its holdings in the

---

[10] Just as inexplicably, the Court reverses Idaho's apportioned tax on ASARCO's dividend income from its 34% interests in Revere Copper & Brass and in General Cable Corp., companies that were "major customers" of ASARCO buying tens of millions of dollars of goods from ASARCO each year.

five affected subsidiaries are not functionally related to the income of its operational nonferrous metals business.[11]

Trying to justify that result, the Court suggests that for it to hold otherwise "would destroy the concept" of a unitary business by expanding the idea until it "becomes no limitation at all" on the power of the States to tax. *Ante*, at 326. In actuality, the Court's decision today shrinks the concept beyond all recognition. Thus it is the Court's holding, not Idaho's tax, that menaces the unitary-business principle. The "linchpin" is loose from the axle.

## III

As a natural consequence of its decision that Idaho cannot tax ASARCO's investment income, the Court simultaneously, if implicitly, rules out taxation of the disputed income by any other nondomiciliary State in which ASARCO conducts its nonferrous metals business, absent a special connection between the would-be taxing State and ASARCO's investments.[12] By the process of elimination, then, the Court's holding provides a partial answer to the question of

---

[11] The Court suggests that my "perception of some of the facts" necessary to reach this conclusion "differs substantially from the record." *Ante*, at 325, n. 21. In fact, however, my view of the facts differs from neither the record nor, I think, that of the Court. As should be apparent, my disagreement with the Court is based, not on the facts, but on the constitutional significance to be given those facts.

[12] The Court is careful not to extend the reach of its holding to domiciliary States. It states the question presented as "whether the State of Idaho constitutionally may include within the taxable income of a *non*domiciliary parent corporation . . . a portion of intangible income . . . that the parent receives from subsidiary corporations having no other connection with the State." *Ante*, at 308–309 (emphasis added). As its holding, the Court asserts that it "cannot accept . . . a definition of 'unitary business' that would permit *non*domiciliary States to apportion and tax dividends '[w]here the business activities of the dividend payor have nothing to do with the activities of the recipient in the taxing State . . . .'" *Ante*, at 327 (citation omitted, emphasis added).

which State or States the Constitution permits to tax this income. The answer the Court gives, however, demonstrates how ill-advised is the course on which it embarks. By its analysis, the Court leaves open three possible choices regarding which States, if any, may tax ASARCO's contested income. Each of these possibilities suffers from crippling defects, pointing to the conclusion that the Court errs in prohibiting apportioned taxation of investment income by nondomiciliary States.

## A

First, there is the disturbing possibility that no State could satisfy the requirements of the Due Process Clause as interpreted today by the Court, so that the contested income would be, in the words of state tax administrators, "nowhere income." [13]  If so, today's holding casts a deep shadow on the ability of the States to tax their fair share of the corporate income they help to produce by providing an "orderly, civilized society." Even more disturbing, given such an interpretation, the Court's decision endangers even federal taxation of passive investment income, since the Federal Government's contacts with the income at issue here obviously cannot exceed the sum of the contacts of the various States. Presumably, the Court's opinion should not be read as erecting so high a hurdle to state and federal taxation.

## B

Second, there is the possibility that only a domiciliary State or States could tax the disputed income. In *Mobil Oil,* the Court stated that "[t]axation by apportionment *and* taxation by allocation to a single situs are theoretically incommensurate, and if the latter method is constitutionally preferred, a tax based on the former cannot be sustained."

---

[13] See Dexter, Taxation of Income from Intangibles of Multistate-Multinational Corporations, 29 Vand. L. Rev. 401, 403 (1976).

445 U. S., at 444–445 (emphasis added). If so, the converse may also be true: if taxation by apportionment is constitutionally condemned, taxation by allocation to a single situs may be constitutionally preferred. The Court's decision today thus could be read as broadly hinting that a domiciliary State enjoys a preference of constitutional dimension justifying its—and only its—taxation of income such as that derived from ASARCO's investments.

Perhaps such a preference could find some blessing in tradition, but certainly not in logic or in the recent opinions of this Court. In *Mobil Oil* itself, the Court declared:

> "We find no adequate justification . . . for such a preference. Although a fictionalized situs for intangible property sometimes has been invoked to avoid multiple taxation of ownership, there is nothing talismanic about the concepts of 'business situs' or 'commercial domicile' that automatically renders those concepts applicable when taxation of income from intangibles is at issue. The Court has observed that the maxim *mobilia sequuntur personam*, upon which these fictions of situs are based, 'states a rule without disclosing the reasons for it.' The Court also has recognized that 'the reason for a single place of taxation no longer obtains' when the taxpayer's activities with respect to the intangible property involve relations with more than one jurisdiction. . . . Moreover, cases upholding allocation to a single situs for property tax purposes have distinguished income tax situations where the apportionment principle prevails." *Id.*, at 445 (citations omitted).

The Court thus made clear only two years ago that a State of domicile cannot expect automatically to meet the due process requirements for the taxation of investment income. As with a nondomiciliary State, a domiciliary State may tax investment income only if it confers benefits on or affords protection to the investment activity. Mere assertion of the ar-

bitrary legal fiction that intangible property is located at its owner's domicile no longer suffices to repel a reluctant taxpayer's due process attack.

The principal functional basis on which this Court has justified taxation by the commercial domicile, moreover, actually supports the fully apportioned taxation of investment income that today's decision rules out, rather than taxation by allocation to a single situs. In *Wheeling Steel Corp.* v. *Fox*, 298 U. S. 193 (1936), for example, we sustained an ad valorem tax on accounts receivable and bank deposits levied by the State in which the taxpayer maintained "the actual seat of its corporate government," *id.*, at 212, for the reason that the intangibles at issue had become " 'integral parts of some local business,' " *id.*, at 210 (quoting *Farmers Loan & Trust Co.* v. *Minnesota*, 280 U. S. 204, 213 (1930)). Thus, other than the arbitrary fiction that intangible property is "located" at the domicile of its owner, the underlying jurisdictional basis for taxation at the commercial domicile is grounded in the fact that intangibles are an "integral part" of the business. This justification supports the principle of apportionment rather than allocation solely to the single domiciliary State. After all, if intangibles are an "integral part" of the unitary business in the domiciliary State, they also are related to the business of the corporation elsewhere. It hardly makes sense to allocate income to the commercial domicile on the theory that business activity at the commercial domicile promotes the unitary business everywhere, and then to ignore those connections and to disregard the claims of the other States in which the unitary business operates. See Dexter, Taxation of Income from Intangibles of Multistate-Multinational Corporations, 29 Vand. L. Rev. 401, 416 (1976).

In short, unless the Court is prepared to abandon the unitary-business principle as applied to investment income and to read into the Constitution the arbitrary legal fiction that intangibles are situated at the domicile of their owner, the

Court will be unable to sustain a domiciliary State's allocation of all passive investment income to itself against due process attack.

## C

We thus arrive at the only remaining possibility. The Court's holding today, taken with past decisions, may imply that ASARCO's investments must be treated as though ASARCO were not only running its nonferrous metals business but also running as another, separate business a sort of mutual fund or holding company specializing in the worldwide nonferrous metals industry. The income from this fictitious separate business would then be taxable on an apportioned basis by those States in which the business was carried out, just as ASARCO's unitary nonferrous metals business could be taxed on an apportioned basis by those States in which that business is conducted.

If so, the Constitution apparently requires that a very small tail be permitted to wag a very big dog. For in the case of companies like ASARCO with tens or hundreds of millions of dollars of dividend income generated by a handful of long-term investments, vast differences in state revenues may turn on whether the quarterly dividend checks sent from "passive" subsidiaries are sent to a clerk in a company office in one State rather than another. Surely it is highly anomalous that the Due Process Clause should require the dividend income of a farflung interstate business selectively to be attributed solely to the State or two in which a few minimal securities management functions are carried out, rather than apportioned among all the States whose "civilized society" has made the income-generating wealth of the larger enterprise possible.

Moreover, if such a requirement were judicially imposed it would create potentially staggering practical difficulties for taxpayers, state tax administrators, and, ultimately, the courts. For despite the Court's easy conclusion today that ASARCO's supposedly discrete investment business is dis-

tinct from ASARCO's operational nonferrous metals business, it is unlikely in practice that the two could be so readily disentangled. Imagine, for example, that the dividend checks were received and the management decisions regarding ASARCO's investments were made at ASARCO's corporate headquarters in one State, while the expertise and information relied on to make those decisions were drawn from corporate sources in many States. In apportioning the income of this purportedly separate investment business among the States, the question inescapably would arise as to what limits the Constitution places on how little of the taxable values at ASARCO's headquarters the expertise- and information-producing States could allocate to ASARCO's investment business as opposed to the theoretically distinct operational nonferrous metals business. Stating the question suffices to show that it reintroduces just the sort of insoluble problem of dividing businesses that the unitary-business principle was designed to avoid. Thus, if the Court does not abandon the separate-business theory that it endorses today, it merely will have substituted the vexing constitutional problem of how to apportion businesses for today's problem of how to apportion taxes.

In sum, the Court has erred. Without a well-founded constitutional mandate, it has straitjacketed the States' ability to develop fair systems of apportionment, prematurely ending the evolutionary process begun by the Uniform Division of Income for Tax Purposes Act and the Multistate Tax Commission. By limiting the apportionment concept by restrictions not found anywhere in the Constitution, moreover, the Court has committed itself to a path leading to more constitutional problems and greater involvement by this Court in the intricacies of interstate taxation.

## IV

The Court's error, moreover, is compounded by its decision to invoke the Due Process Clause as the source of its author-

ity, despite the ready availability of the Commerce Clause.[14] For unlike a Commerce Clause ruling which is susceptible to repair by Congress, today's due process decision may be beyond Congress' power to correct.

This constitutional shortsightedness overlooks the fact that Congress, not this Court, holds the ultimate responsibility for maintaining a healthy system of interstate commerce. Moreover, it is Congress, not this Court, which has the institutional tools to deal with these complex problems. Con-

---

[14] This Court's authority to invalidate state legislation because it interferes with interstate commerce is inferred from the Constitution's grant to *Congress* of the authority to regulate interstate commerce. Art. I, § 8, cl. 3. For this reason, Congress may "confe[r] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy." *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27, 44 (1980) (citations omitted). Consistent with this principle, it has long been established that Congress generally has the power to "overrule" a decision of this Court invalidating state legislation on Commerce Clause grounds. Compare *Leisy* v. *Hardin,* 135 U. S. 100 (1890), with *In re Rahrer,* 140 U. S. 545 (1891). By contrast, Congress generally cannot waive a ruling of this Court decided under the Due Process Clause. Accordingly, this Court's "threshold" for invalidating state legislation should be considerably higher under the Due Process Clause than under the Commerce Clause.

In the present case, the Court could have reached its result by relying on the Commerce Clause. Our cases establish that analysis of the validity of state taxation under the Commerce Clause is similar to analysis under the Due Process Clause. The test under the Commerce Clause is whether the tax "'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.'" *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont,* 445 U. S., at 443 (quoting *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274, 279 (1977)). In his dissent in *Mobil Oil,* JUSTICE STEVENS explained how a violation of the Due Process Clause could also be a violation of the Commerce Clause: "[I]f, in a particular case, use of an allocation formula has the effect of taxing income earned by an interstate entity outside the State, it could alternatively be said to have the effect of taxing the income earned by that entity inside the State at a rate higher than that used for a comparable, wholly intrastate business, a discrimination that violates the Commerce Clause." 445 U. S., at 452, n. 4.

gress itself is only too aware of the limitations under which the judiciary operates when it attempts to deal with the knotty problems of state taxation of multistate enterprises within a federal system. As the Special Subcommittee on State Taxation of the Committee on the Judiciary of the House of Representatives bluntly put it:

"[T]he courts have over the years attempted to resolve the numerous and complex problems [of state taxation of interstate commerce] brought before them. . . . [T]heir decisions on State taxation leave much to be desired both in individual cases and as a body of law. The reason for this inadequacy is completely unrelated to the ability or diligence of a particular court or of any particular judge. The inadequacy is entirely institutional.

"The problem arises from the fact that a court deals in absolutes, and in this area an absolute decision in either direction is not likely to be satisfactory. . . . [T]he court is substantially handicapped by its inability to explore fully the nature, the extent, and the impact of the burdens created [by state taxes].

"The inherent inadequacy of the judicial process to achieve a full accommodation of the competing demands of the States for taxes and of the national interest in unhindered commerce, is perhaps nowhere more clear than in the apportionment of income for tax purposes. . . . In the typical case of this kind, the tax of only one of the States would be before the court . . . . The court has only the records of the cases before it with only such information as may be necessary to state the facts and consequences in those cases. On this basis, is the court in a position to choose between [competing approaches], striking down all formulas containing one or the other? If so, what standard should it use in deciding which one? Given the adversary system of litigation, how does the court obtain the necessary data on economic burdens and revenue consequences? . . .

"Difficulties also arise from the limitations of the judicial process in prescribing what constitutes adequate jurisdiction to tax. As a question of due process the court can do no more than decide on conceptual grounds . . . whether the quality of the relationship in the case before it is sufficient to sustain the imposition of the tax. . . .

". . . It is no better suited to devise and prescribe general rules setting the optimum level of jurisdiction than it is to impose a uniform apportionment formula. For example, the judicial process does not lend itself to a determination of what level of nexus would strike the most equitable balance between the demands of the States for revenue and the probable burdens of compliance." H. R. Rep. No. 1480, 88th Cong., 2d Sess., 11–12 (1964).

Nor is Congress alone in recognizing the limitations of the judiciary in this field. Many Justices of this Court have acknowledged "the weakness of the judicial process in these tax questions where the total problem . . . reaches us only in installments." *Northwest Airlines, Inc.* v. *Minnesota,* 322 U. S. 292, 307 (1944) (Jackson, J., concurring). The Court itself has said: "To introduce a new doctrine of tax apportionment . . . is not merely to indulge in constitutional innovation. It is to introduce practical dislocation into the established taxing systems of the States. . . . [C]ertainly we ought not to embarrass the future by judicial answers which at best can deal only in a truncated way with problems sufficiently difficult even for legislative statesmanship." *Id.,* at 299–300 (opinion of the Court). Surely in a case such as the one before us, Congress, unconfined by "the narrow scope of judicial proceedings," *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 13 How. 518, 592 (1852) (Taney, C. J., dissenting), is in a better position "in the exercise of its plenary constitutional control over interstate commerce, not only [to] consider whether such a tax as now under scrutiny is consistent with the best interests of our national economy, but . . .

also on the basis of full exploration of the many aspects of a complicated problem [to] devise a national policy fair alike to the States and our Union." *McCarroll* v. *Dixie Greyhound Lines, Inc.*, 309 U. S. 176, 189 (1940) (Black, J., dissenting). But it is just this sort of congressional action which today's due process decision appears to preclude. This Court should not so confidently pre-empt the Congress.

## V

In sum, the Court has focused its attention solely on the question whether ASARCO's interests in its subsidiaries represented active investments and concludes they did not. The Court then permits this initial erroneous result to derail its analysis. Instead of continuing, the Court fails to consider the possibility that ASARCO's investment decision-making was not segregated from its operational nonferrous metals business; fails to consider the possibility that ASARCO's investments were simply an interim use of long-term funds accumulated for ultimate use elsewhere in the business; fails to consider the possibility that ruling out apportioned taxation of income earned from intangibles may imply that such income is "nowhere income"; fails to consider the possibility that its ruling may be inconsistent with the unitary-business principle because it suggests that income from intangibles may be taxed only by a domiciliary State; and fails to consider the possibility that it may be as difficult to apportion a business as to apportion income for constitutional purposes. Finally, and most distressingly, the Court fails to consider its own limitations and Congress' constitutional prerogatives. Had the Court given the intricate questions presented by this case the attention they deserve, it might have reached a different result. I respectfully dissent.