(No. 62485.—

COLORCRAFT CORPORATION, INC., Appellee, v. THE DEPARTMENT OF REVENUE, Appellant.

*Opinion filed May 21, 1986.*

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Imelda R. Terrazino, Assistant Attorney General, of Chicago, of counsel), for appellant.

David Duez, of McDermott, Will & Emery, and Philip M. Moilanen, of Stanton, Bullen, Nelson, Moilanen & Klaasen, P.C, of Jackson, Michigan, for appellee.

CHIEF JUSTICE CLARK delivered the opinion of the court:

Colorcraft Corporation, the plaintiff taxpayer, filed exemption certificates claiming a use tax exemption for 31.25% of the cost of two pieces of equipment for use in its photofinishing business pursuant to section 3 of the Use Tax Act (Ill. Rev. Stat. 1983, ch. 120, par. 439.3). A subsequent audit by the defendant, the Department of Revenue (Department), resulted in the disallowance of the claimed exemptions and the issuance of a notice to Colorcraft of tax liability for the alleged use tax deficiency.

Colorcraft filed a protest with the Department and requested a hearing. After the hearing, the hearing officer entered findings of fact and law and recommended that the claimed exemptions be denied. The Department adopted the hearing officer's recommendation and made an assessment against Colorcraft for a tax deficiency in the amount of $4,130.83. Colorcraft filed a complaint in the circuit court of Sangamon County seeking review of the ruling of the Department. The circuit court found that the Department's decision was against the manifest weight of the evidence. The Department had found that

Colorcraft's photofinishing business was a service occupation and that Colorcraft was not engaged in manufacturing so as to be allowed the claimed exemption for the use tax. The circuit court ordered the Department's assessment of tax deficiency set aside. The Department appealed to the appellate court.

The appellate court affirmed the circuit court, holding that "the Department's classification of photofinishing as a service occupation [was] unreasonable and that plaintiff [should] consequently [be] entitled to the use tax exemption for machinery and equipment used primarily in the manufacturing of tangible personal property." (136 Ill. App. 3d 217, 225.) The Department filed a petition for leave to appeal in this court pursuant to our Rule 315 (87 Ill. 2d R. 315), and we allowed its petition. We now reverse the appellate court.

The facts of the case are adequately set forth in the appellate court opinion, and we will only repeat them to the extent necessary to discuss the issues raised herein.

There are two issues before this court. The first issue is whether Colorcraft's photofinishing business is a service occupation or whether Colorcraft is engaged in manufacturing, thereby making the two pieces of equipment it purchased for use in its photofinishing business properly claimed exemptions. The second issue is whether the Department's reference in its brief to the United States Standard Industrial Classification Manual is improper.

Section 3 of the Use Tax Act provides:

"The tax imposed by this Act does not apply to the use of machinery and equipment primarily in the process of the manufacturing or assembling of tangible personal property for wholesale or retail sale ***." Ill. Rev. Stat. 1983, ch. 120, par. 439.3.

Section 3 defines "manufacturing process" as follows:

"the production of any article of tangible personal property, whether such article is a finished product or an arti-

cle for use in the process of manufacturing or assembling a different article of tangible personal property, by procedures commonly regarded as manufacturing, processing, fabricating, or refining which changes some existing material or materials into a material with a different form, use or name. In relation to a recognized integrated business composed of a series of operations which collectively constitute manufacturing, or individually constitute manufacturing operations, the manufacturing process shall be deemed to commence with the first operation or stage of production in the series, and shall not be deemed to end until the completion of the final product in the last operation or stage of production in the series." Ill. Rev. Stat. 1983, ch. 120, par. 439.3.

Section 3 defines "assembling process" as follows:

"the production of any article of tangible personal property, whether such article is a finished product or an article for use in the process of manufacturing or assembling a different article of tangible personal property, by the combination of existing materials in a manner commonly regarded as assembling which results in a material of a different form, use or name." Ill. Rev. Stat. 1983, ch. 120, par. 439.3.

As the appellate court noted, Colorcraft presented evidence at the hearing to demonstrate that photofinishing is essentially an automated process. Colorcraft contends that its business requires no engineering or design work, personal service, skill, or artistic ability. Colorcraft alleges that its employees perform routine labor tasks such as loading and operating the machines, rather than any individualized piecework such as tinting, coloring, or retouching of pictures or negatives.

The record discloses that the process used by Colorcraft is as follows. A customer brings his exposed film to one of the approximately 675 retail dealers throughout central Illinois that use Colorcraft's services. These dealers include drugstores, supermarkets, and camera shops. Colorcraft picks up the film at the dealer with the

promise that it will be returned within 24 to 48 hours. Colorcraft sorts the film by size and type, marks it for identification, and splices it onto a 200-foot reel of film. Color negatives are then produced by treating this film with a developer solution.

Once the negatives are produced, they are fed into an automatic printer, like one of the machines in question. The negatives and unexposed photographic paper are fed into the machine together, and the light that passes through the negatives transfers an image onto the paper. The photographic paper is then fed through a photographic paper processor, like the other machine in question, which treats the paper with various chemical solutions. Finally, the paper and negatives are run through a cutting machine, inspected, packaged, and delivered to the dealer who ultimately delivers them to the customer.

Colorcraft contends that its photofinishing business is so mechanized that it resembles an assembly line where a product is created during a manufacturing process.

At the administrative hearing, the Department's *prima facie* case for a tax deficiency consisted of a presentation of its records of the audit of Colorcraft performed by one of the Department's employees.

The hearing officer who presided over the administrative hearing concluded that Colorcraft did not qualify for the machinery and equipment exemption. In his recommendation he stated:

> "The record contains a very detailed narrative with photographs of taxpayer's photoprocessing procedures at its Jacksonville plant where the two pieces of equipment here involved are installed. Basically this process entails the normal functions of developing film and preparing either a slide or print therefrom. The basic difference, I find, between the way taxpayer performs these functions and a small volume serviceman photoprocessor performs these functions is the fact that due to the volume of taxpayer business taxpayer does it at very high speed and in

great volume. I therefore find that taxpayer is a subcontractor-serviceman as that term is used in *86 Illinois Administrative Code* Chapter I, Section 140.145."

As the appellate court noted, the Department relies upon its own administrative regulations to defend its decision denying Colorcraft the claimed use tax exemption. These regulations specifically provide that persons engaged in the business of photofinishing are engaged in a service occupation and should be taxed as such (86 Ill. Admin. Code, ch. 1, sec. 130.2000). These regulations were promulgated to coincide with both the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1983, ch. 120, par. 440 *et seq.*) and the Service Occupation Tax Act (Ill. Rev. Stat. 1983, ch. 120, par. 439.101 *et seq.*). As a matter of fact, the Department's Service Occupation Tax Regulation 140.145 is directly on point. It provides:

"Multi-Service Situations.

(a) If a primary serviceman (such as an advertising agency, or a special order printing broker, or optometrist or oculist, *or druggist or camera shop handling photofinishing orders for customers*, or a special order diemaker) farms or jobs out all or a portion of the work to other servicemen (such as printers, litho-graphers, opticians, *photofinishers*, special order diemakers, etc.), the Service Occupation Tax liability will be determined in accordance with the following provisions in the statute: 'When a serviceman contracts out part or all of the services required in his sale of service, it shall be presumed that the cost price to the serviceman of the property transferred to him by his sub-contractor is equal to 50% of the subcontractor's charges to the serviceman in the absence of proof of the consideration paid by the subcontractor for the purchase of such property, or in the absence of proof that the tax imposed by this Act was paid by his subcontractor (in which latter event there shall be no further liability in the transaction under this Act).' (Section 2 of the Service Use Tax Act.)" (Emphasis added.) 86 Ill. Admin. Code, ch. 1, sec. 140.145(a).

Under the above-quoted provision, the transfer of the developed film to its owner is not a sale of tangible personal property at retail, and the owner does not pay the retailers' occupation tax or use tax on the film. Instead, the owner pays a service use tax which is less than the retailers' occupation tax or use tax.

In its petition for leave to appeal before this court, the Department gave the following example to illustrate the existing tax system:

"A purchaser initially buys a roll of film for $2 at Walgreens. This is a sale at retail and the purchaser pays a use tax on the $2. The purchaser uses the film and returns it to Walgreens, the primary serviceman, for developing. Walgreens farms it out to plaintiff, the subcontractor-serviceman. Plaintiff develops the film and charges Walgreens $2 for its service. Walgreens, in turn, marks up plaintiff's charge by 100% and charges the owner of the film $4. Under Illinois law, the owner of the film does not pay a use tax on $4 for the developed film, but pays a service use tax only on $1, which is 50% of plaintiff's [$2 developing] charge to Walgreens."

See Ill. Rev. Stat. 1983, ch. 120, par. 439.33.

The classification of photofinishing as a service occupation is derived from three Illinois Supreme Court cases which dealt with the taxation of other types of graphic arts and related occupations. In these cases, this court held that people engaged in the graphic arts are not in the business of selling tangible personal property and therefore they are not liable for the retailers' occupation tax. *H. G. Adair Printing Co. v. Ames* (1936), 364 Ill. 342; *A.B.C. Electrotype Co. v. Ames* (1936), 364 Ill. 360; *J. A. Burgess Co. v. Ames* (1935), 359 Ill. 427.

In *Adair*, commercial printing was held to be a service occupation, and therefore commercial printers were not held liable for the retailers' occupation tax. This court reasoned that in the commercial printing process, the printer, in carrying out his contract of service, uses

ink and destroys the plain paper he uses as far as its commercial value is concerned. The paper is of no use or value to any person other than the person for whom the printing is done, and therefore the commercial printer is "not engaged in the business of selling tangible personal property but in the business of printing—one of the graphic arts." *H. G. Adair Printing Co. v. Ames* (1936), 364 Ill. 342, 343.

In *A.B.C.*, this court similarly held that persons engaged in producing electrotypes, stereotypes, and matrices were not liable for the retailers' occupation tax. This court reasoned that since the materials used in these processes were of no use to anyone other than the customer for whom the electrotype, stereotype or matrix was made, "[w]hat the customer really pays for is the skill, labor and use of the machinery and equipment of the electrotyper." (*A.B.C. Electrotype Co. v. Ames* (1936), 364 Ill. 360, 361.) This court held: "The electrotyper is engaged in the business of furnishing that skill and labor and the use of that machinery—not in the sale of tangible personal property at retail." 364 Ill. 360, 361.

In *Burgess*, the court held that blueprinters and photostaters were not subject to the retailers' occupation tax because they engaged primarily in the provision of services through the use of devices which reproduced images furnished by the customer. The paper which was used in the process was destroyed and of no subsequent value except to the owner. This court held that "[t]he paper is a mere incident; the skilled service is that which is required." *J. A. Burgess Co. v. Ames* (1935), 359 Ill. 427, 429.

As the appellate court stated, a standard has been developed to determine whether a business is a service or a retail occupation. The test which is applied was stated in *Spagat v. Mahin* (1971), 50 Ill. 2d 183, 189, which provides:

" 'If the article sold has no value to the purchaser except as a result of services rendered by the vendor and the transfer of the article to the purchaser is an actual and necessary part of the service rendered, then the vendor is engaged in the business of rendering service and not in the business of selling at retail. If the article sold is the substance of the transaction and the service rendered is merely incidental to and an inseparable part of the transfer to the purchaser of the article sold, then the vendor is engaged in the business of selling at retail.' *Velten & Pulver, Inc. v. Department of Revenue* [1963], 29 Ill. 2d 524, 529; *Dow Chemical Co. v. Department of Revenue* [1962], 26 Ill. 2d 283, 285; *Kellogg Switchboard & Supply Corp. v. Department of Revenue* [1958], 14 Ill. 2d 434, 437."

In *Spagat,* the issue was whether the sale and installation of custom wall-to-wall carpeting was a retail occupation or a service occupation. This court held that "it is the carpeting which is the substance of the transaction, and the services involved in laying the carpeting wall-to-wall, no matter how skillfully performed, are 'merely incidental to and an inseparable part of the transfer.' " *Spagat v. Mahin* (1971), 50 Ill. 2d 183, 189.

Then, in *First National Bank v. Department of Revenue* (1981), 85 Ill. 2d 84, this court was asked to decide whether computer software was tangible personal property so as to be taxable under the Use Tax Act. This court held that computer software programs were intangible property not subject to the use tax because the essence of the transaction was the service of creating the programs, and the transfer of the magnetic tapes merely incidental.

In *J. H. Walters & Co. v. Department of Revenue* (1969), 44 Ill. 2d 95, this court was presented with the issue of whether a taxpayer's sales of sheet-metal fabrications made to order constituted a service occupation, or whether the taxpayer was engaged in the business of

selling tangible personal property at retail, making him liable under the Retailers' Occupation Tax Act. This court held that there are several factors which may be considered in making this determination. The three factors gleaned from this and other cases are: (1) the ratio between the bare cost of materials and the ultimate sales price; (2) the buyer's motive for selecting the particular seller; and (3) whether the item at issue is a unique or special-order item or a standard-stock item.

Applying the standards previously enunciated by this court and drawing analogies to the various cases cited above, we believe that photofinishing is properly classified as a service occupation and that Colorcraft's claimed use exemptions were properly denied by the Department.

We believe that the article sold in the instant case, the finished prints, have no value to the customer except as a result of the services rendered by Colorcraft. As was the case in *First National Bank*, although the transfer of the prints, like the magnetic tapes, is an actual and necessary part of the service rendered, it is the service of creating the prints which is the essence of the transaction.

The instant case is distinguishable from the *Spagat* case because the carpeting in *Spagat* was of value to the customer even without the installation. Many times, carpeting is purchased and installed by another. But more importantly, carpeting is tangible personal property which can be sold to another customer. Carpeting can be recut for installation in a room smaller than the room for which the carpet was originally ordered.

We believe that the instant case is analogous to the *Adair, A.B.C.,* and *Burgess* cases since all of those cases dealt specifically with occupations within the area of the graphic arts. In the instant case, as in those cases, the process employed destroys the materials used as far as

their commercial value is concerned. Once the paper is used to make the customers' prints, except perhaps in rare instances, it is of no value to anyone other than the person for whom the pictures are developed. It is unlikely that the average person would be even remotely interested in purchasing prints developed for another. Therefore, Colorcraft is not in the business of selling tangible personal property. It seems apparent that the raw materials used are a mere incident to the service which is rendered. The customer is really paying for the skill, labor, and use of the machinery and equipment of the photofinisher.

Our disagreement with the analysis employed by the appellate court is rooted in the appellate court's flawed major premise: that the service Colorcraft performs is merely incidental to the purchase of the prints. Although the ratio of raw materials to the ultimate cost is a relevant factor, and it is alleged that the cost of the raw materials is more than the cost of labor in this case, that factor is not in and of itself dispositive.

The appellate court states that in this case "[a] customer does not select plaintiff [Colorcraft] based upon any special expertise possessed by plaintiff; *** the consumer is motivated primarily by price; [and] quality of the photographs and the speed with which the photographs are returned to the dealer are secondary considerations." 136 Ill. App. 3d 217, 224.

The price, quality, and the speed with which the prints are developed all pertain to the issue of Colorcraft's expertise and the buyer's motive for selecting Colorcraft. The fact that the quality and speed are allegedly viewed by the consumer as secondary is immaterial.

We most stringently disagree with the appellate court's reasoning regarding the last factor to be considered—the uniqueness of the item. The uniqueness, we believe, speaks to whether the prints are of any value to

any person other than the person for whom they were developed. As we stated earlier, it is highly unlikely that anyone would be interested in purchasing another person's prints. These prints are not a standard or stock item. Therefore, we believe the prints are unique.

We cannot agree with the circuit and appellate courts that the Department's decision, that Colorcraft is engaged in a service occupation and not in the business of selling tangible personal property, is against the manifest weight of the evidence. Rather, we believe that the Department's own regulations, the Retailers' Occupation Tax Act, the Use Tax Act, and the prior decisions of this court all support the conclusion that Colorcraft provides a service and should be taxed as such.

Lastly, the Department argues in its brief that the classification of photofinishing as a service occupation is consistent with the United States Standard Industrial Classification Manual and makes reference to various sections of the manual. Colorcraft argues that reference to the manual should be ignored by this court since the manual was not referred to in any earlier proceedings. It further argues that reliance on the manual is prejudicial to Colorcraft, and that use of the manual is inappropriate in this case. While it may be true, as the Department contends, that the manual may be persuasive, we do not believe it is necessary to consider the manual or any cases from other jurisdictions, since the law on this issue in Illinois is clear.

Accordingly, for all the reasons stated, the judgments of the appellate and circuit courts are reversed, and the assessment of the Department is confirmed.

*Judgments reversed;*
*assessment confirmed.*