THE NEW YORKER MAGAZINE, INC., Plaintiff-Appellant, v. THE DEPARTMENT OF REVENUE, Defendant-Appellee.

First District (1st Division)  No. 1—88—0379

Opinion filed August 28, 1989.

Sidley & Austin, of Chicago (J. Douglas Donenfeld, Henry L. Mason III, and Lisa A. Hausten, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Deborah L. Ahlstrand, Assistant Attorney General, of Chicago, of counsel), for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

This action arises from the circuit court's affirmance on administrative review of the Illinois Department of Revenue's (the Department's) decisions regarding two tax deficiencies issued to the New Yorker Magazine, Inc. (the New Yorker). The New Yorker is a unitary business, operating in more than one State, which engages in the business of publishing a magazine known as "The New Yorker." It derives its business revenue from subscriptions, newsstand sales and ad-

vertising, and pays taxes on its business income to five States, including Illinois.

The New Yorker appeals the circuit court's decision, contending that (1) the circuit court erred in finding that the Department properly apportioned its receipts from advertising space, subscription sales and newsstand sales under the Illinois Income Tax Act (the Act) (Ill. Rev. Stat. 1985, ch. 120, par. 1—101 *et seq.*), and (2) the Act is unconstitutional as applied to the New Yorker in the instant case. We affirm.

The Department issued a tax deficiency notice to the New Yorker for the years 1975-77 and another for the years 1979-81. After administrative hearings were held for both audit periods, a January 18, 1985, decision issued assessing the New Yorker $56,279 for the first period and a March 31, 1986, decision issued assessing it $39,325 for the second period. Both decisions increased the New Yorker's tax liability to Illinois because the New Yorker underreported its sales under the Act's three-factor apportionment formula.

The Act contains a three-factor formula that apportions income of a corporation engaged in a multistate business. The formula, adopted from the language of the "Uniform Division of Income for Tax Purposes," includes sales, property and payroll factors. Under this formula, each of these factors is considered as a fraction. The numerator of each fraction is the Illinois portion of the value, while the denominator represents the total value in all jurisdictions. The resulting percentage represents the taxing percentage on the taxpayer's business activity in Illinois. Ill. Rev. Stat. 1985, ch. 120, par. 3—304(a)(3).

■■ ■ Illinois' power to apportion the income of an integrated, multistate business, as well as that of other States, is restricted by the commerce clause and due process clause of the United States Constitution. (U.S. Const., art. I, §8, cl. 3; U.S. Const., amend. XIV.) These clauses require a "minimum connection" between the interstate activities and the taxing State and a "rational relationship" between the income attributed to that State and the intrastate values of the enterprise. (*ASARCO, Inc. v. Idaho State Tax Comm'n* (1982), 458 U.S. 307, 328, 73 L. Ed. 2d 787, 802, 102 S. Ct. 3103, 3115; *Exxon Corp. v. Wisconsin Department of Revenue* (1980), 447 U.S. 207, 219-20, 65 L. Ed. 2d 66, 79, 100 S. Ct. 2109, 2118; *Moorman Manufacturing Co. v. Bair* (1978), 437 U.S. 267, 273, 57 L. Ed. 2d 197, 204, 98 S. Ct. 2340, 2344.) The Constitution, however, imposes no single formula on the States because of the difficulties in arriving at precise territorial allocations of value (*Container Corp. v. Franchise Tax Board* (1983), 463 U.S. 159, 164, 77 L. Ed. 2d 545, 552, 103 S. Ct.

2933, 2939), although an application of an apportionment formula will be struck down where the taxpayer can prove by clear and cogent evidence that the income attributed to the State is out of appropriate proportion to the business transacted in the State or has led to a grossly distorted result. *Container Corp.*, 463 U.S. at 164, 77 L. Ed. 2d at 552, 103 S. Ct. at 2939-40; *Butler Brothers v. McColgan* (1942), 315 U.S. 501, 507, 86 L. Ed. 991, 996, 62 S. Ct. 701, 704.

The business activities of the multistate business here are conducted as follows: The New Yorker is headquartered in New York, its corporate domicile. Its management and editorial functions are performed in New York, including the acceptance of subscriptions, the selection of magazine materials, the preparation of the copy and layouts for printing, the execution and approval of advertising contracts, and the approval of advertising copy. It maintains six branch offices for advertising solicitations, one of which is located in Chicago, Illinois. These offices employ 7% of the New Yorker's personnel, with the remaining percentage of the personnel employed in New York.

The printing of the magazine is contracted to R.R. Donnelley & Sons, Inc., a commercial printer located in Chicago. Galleys from the printing are sent to New York for proofreading. One of five production supervisors from New York is at the printing plant on a rotating basis to resolve manufacturing problems and to aid in the magazine's prompt distribution. One clerical employee of the New Yorker is permanently assigned to Illinois to perform duties such as typing, checking the number of issues printed each week, calculating and recording weekly lineage, and maintaining offset evaluation records.

Upon printing, "newsstand" copies are shipped from the printer to wholesalers in various parts of the country pursuant to instructions given by Curtis Circulation Company (Curtis), an independent contractor and a Philadelphia-based circulation company under contract with the New Yorker to sell its magazine. The New Yorker instructs Curtis as to the quantity of issues to be shipped, and the New Yorker remains responsible for arranging and paying for special promotions.

Before considering the New Yorker's constitutional claims, we address its contention that the circuit court erred in finding that the Department correctly applied the Act's apportionment provisions. The decision for the years 1975-77 found that the New Yorker failed to include as a sale of tangible personal property in the sales factor of the apportionment formula its advertising income and its total newsstand and subscription sales that were shipped from its printer but were not taxed in other jurisdictions. The decision for the years 1979-81 similarly taxed the New Yorker, except that its newsstand and subscrip-

tion sales from the shipment of its printer were included only for the period January 1, 1979, to September 8, 1979, due to a 1979 statutory amendment to the Act.

The New Yorker first argues that the circuit court erred in finding that its advertising receipts were sales of tangible personal property under the sales factor in the Act's apportionment formula. The formula's distinction between the sale of tangible and intangible property is critical to the New Yorker's tax liability here because income from the sale of tangible personal property is allocable to Illinois where (1) the property is delivered or shipped to a purchaser within Illinois, or (2) the property is shipped from an "office, store, warehouse, factory or other place of storage" in Illinois and is not taxable in the purchaser's State (Ill. Rev. Stat. 1985, ch. 120, pars. 3—304(a)(3)(B)(i), (ii)), whereas income other than from the sale of tangible personal property is allocable to Illinois only if the greater proportion of the income-producing activity is performed in Illinois (Ill. Rev. Stat. 1985, ch. 120, par. 3—304(a)(3)(C)(ii)).

No dispute exists here that the sale of the magazine constitutes the sale of tangible personal property. (*Time, Inc. v. Hulman* (1964), 31 Ill. 2d 344, 201 N.E.2d 374.) The parties disagree, however, as to whether the revenue derived from the New Yorker's advertising transactions should be included in that category or treated separately from the circulation revenue as a sale of intangible property. The New Yorker asserts that the substance of its advertising transactions is the provision of the service of communicating a message to the public, wherein no tangible property is transferred to the advertiser. The Department, on the other hand, maintains that receipts from the sale of advertising space are sales of tangible personal property because the sale of advertising space is an integral part of the publication and depends upon the circulation of the magazine.

■ In determining this issue, we are mindful that substantial weight and deference must be afforded an interpretation given to a statute by the agency charged with its enforcement. (*Airey v. Department of Revenue* (1987), 116 Ill. 2d 528, 508 N.E.2d 1058.) Two such interpretations are brought to our attention. The New Yorker refers us to the Illinois Department of Revenue Rules and Regulations, effective July 24, 1971, to December 24, 1981, which provide:

> "For purposes of the sales factor, sales of services not directly related to real or tangible personal property, *such as advertising services*, legal and accounting services, management consulting services, will be presumed to be in Illinois if the place from which the service is directed or controlled is in Illinois."

(Emphasis added.) (Department of Revenue Rules and Regulations, July 24, 1971.)

As the department urges, we do not believe this regulation demonstrates the Department's intent in this regard because "advertising services" most likely refers to traditional advertising services performed by advertising agencies, such as creating the "ad" concept. The Department's interpretation of the statutory provision is reflected in a position memorandum issued August 15, 1978, by its income tax and hearing division, stating that sales of advertising space are to be included in sales of tangible personal property because they are an integral part of the publication and the sale of magazines. Position Memorandum 1978-2, Illinois Department of Revenue, Income Tax and Hearing Division,.August 15, 1978.

To support its position that advertising proceeds should be considered as a service transaction and not as a sale of tangible property, the New Yorker cites Illinois and Federal case law. The Illinois cases cited, *Time, Inc. v. Hulman* (1964), 31 Ill. 2d 344, 201 N.E.2d 374, *Colorcraft Corp. v. Department of Revenue* (1986), 112 Ill. 2d 473, 493 N.E.2d 1066, and *Dinner Theatre Associates, Ltd. v. Department of Revenue* (1985), 139 Ill. App. 3d 911, 488 N.E.2d 288, involve the question of whether a business is subject to taxation as a manufacturing process under the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1987, ch. 120, par. 440 *et seq.*) or as a service under the Service Occupation Tax Act (Ill. Rev. Stat. 1987, ch. 120, par. 439.101 *et seq.*).

*Time* established that the test for determining whether a business transfers tangible personal property is whether the transfer is the substance of the transaction or merely incidental to a service. (*Time*, 31 Ill. 2d at 349, 201 N.E.2d at 377.) The Illinois Supreme Court expounded upon this test in *Colorcraft*:

> "If the article sold has no value to the purchaser except as a result of services rendered by the vendor and the transfer of the article to the purchaser is an actual and necessary part of the service rendered, then the vendor is engaged in the business of rendering service and not in the business of selling at retail. If the article sold is the substance of the transaction and the service rendered is merely incidental to and an inseparable part of the transfer to the purchaser of the article sold, then the vendor is engaged in the business of selling at retail." (*Colorcraft*, 112 Ill. 2d at 482, 493 N.E.2d at 1069, citing *Velten & Pulver, Inc. v. Department of Revenue* (1963), 29 Ill. 2d 524, 529, 194 N.E.2d 253, 256.)

Applying the above test to the photo-finishing business in *Colorcraft*,

the supreme court found the business to be properly classified as a service occupation because its service of creating the prints is the essence of its transactions, with the finished prints having no value to the customer except as a result of these services.

In *Dinner Theatre*, the appellate court found a dinner-theatre business, which included both a dinner and theatrical production in its admission price, to be properly taxed as a manufacturing process on the one-half admission price which was attributed to the sale of the meal served. The court reasoned that the business engaged in two separate and divisible capacities through its dinner-theatre operation, in which the sale of meals was an integral part of, and not merely incidental to, the operation. *Dinner Theatre*, 139 Ill. App. 3d at 913-14, 488 N.E.2d at 289.

■ Apart from our recognition that the above cases do not involve an interpretation of the statutory provision in issue here, we do not believe these cases support the New Yorker's position. The substance of the business activity here is the sale of the magazine. Unlike *Colorcraft*, where the plaintiffs were in the business of developing film, the New Yorker is not in the business of advertising but in the business of publishing a magazine.

The sale of the advertising space is also incidental to and inseparable from the circulation sales. Contrary to *Dinner Theatre*, the New Yorker is not functioning in two separate and divisible capacities so that the revenues generated are to be treated separately for tax purposes. The advertising revenue here is dependent upon and part and parcel of the publication and sale of the magazine.

We reject the New Yorker's assertion that a finding of a service here is even more compelling than the above cases because no article is transferred *to the advertiser*. This reasoning confuses the buyer-seller analysis of the sales tax statutory scheme with the statutory scheme in issue here, one concerned with apportioning the total income of a multistate business. Thus, we find that the circuit court did not err in finding the advertising revenue to be includible with the circulation revenue as a sale of tangible property under the Act.

Our conclusion does not conflict with the Federal cases cited by the New Yorker. Contrary to the New Yorker's assertion, the United States Supreme Court in *Western Live Stock v. Bureau of Revenue* (1938), 303 U.S. 250, 82 L. Ed. 823, 58 S. Ct. 546, did not broadly hold that advertising revenue should be apportioned independently of circulation revenues. The Supreme Court there addressed only the question of whether the State's 2% tax imposed solely on the gross receipts from the sale of advertising space of a business which pub-

lished newspapers and magazines circulated in and out of the State placed an unconstitutional burden on interstate commerce. The Court sustained this broadly worded "unapportioned" tax because the concerns with burdening commerce with taxing unapportioned gross receipts were not present there. It noted that all aspects of the publishing of the magazine and the sale of advertising space were purely local and therefore beyond the control and taxing power of other jurisdictions. *Western Live Stock*, 303 U.S. at 260, 82 L. Ed. at 830, 58 S. Ct. at 550-51.

The New Yorker also misplaces its reliance on *Broadcasting Publications, Inc. v. District of Columbia* (D.C. Cir. 1962), 313 F.2d 554, as distinguishing between national and local publications for purposes of taxing circulation and advertising revenues. The court in *Broadcasting Publications* confronted the question of whether the District of Columbia properly taxed all the business income of the taxpayer under its statutory provision that the District could tax only the income of a multistate business which is attributable to the business activity within the District. The taxpayer argued that the court's previous decision in *District of Columbia v. Evening Star Newspaper Co.* (D.C. Cir. 1959), 273 F.2d 95, compelled that it be taxed only based upon its circulation, apportioned according to the resident of the subscriber.

In finding that the District properly taxed all the taxpayer's income, the court reasoned that Congress did not make the "circulation test" the exclusive apportionment formula for all types of publications; that a publications business is comprised of various operations, including newsgathering, advertising solicitation, publication, and magazine distribution; and that the total activity must be examined in each case to select the function reflecting the geographic sources of income. It concluded that, unlike *Evening Star*, where the location of subscribers reflected the geographical derivation of the newspaper's income because its central function was the dissemination of news and the distribution of newspapers, all the significant factors and the majority of the taxpayer's activities in publishing the trade magazine occurred within the District. (*Broadcasting Publications*, 313 F.2d at 559-60.) Thus, as *Broadcasting Publications* addressed only whether the District was justified in apportioning all the taxpayer's income to itself under its broad statutory provision requiring apportionment based upon business activities and did not address the question of whether the sale of advertising space is the sale of tangible personal property or whether circulation and advertising revenues should be treated separately for allocation purposes, it lends no support for the

New Yorker's position in the case at bar.

*Evening Star,* however, did address the question of whether circulation and advertising must be separated for apportionment purposes. In finding that the two should be treated together for apportionment purposes, the court reasoned:

> "The interrelationship between [circulation and advertising revenue] is so intimate that a separation would of necessity be arbitrary and artificial. It is apparent that all revenues *** rest ultimately upon circulation and readership. Merchants place and pay for advertising because of those who buy and read papers. The advertising rates are directly related to circulation. The activities of the Taxpayer are directed to one end: the sale of newspapers, which contain news and ads from many and varied sources. That the advertising revenue is greater than the circulation revenues is not controlling; the former is the fruit of the latter. *** In a sense advertising revenues are subsidiary since they are dependent upon circulation." (*Evening Star,* 273 F.2d at 103.)

This sound reasoning further supports our conclusion that the circuit court correctly found that advertising and circulation revenues are to be treated together as the sale of tangible property under Illinois' apportionment formula.

The New Yorker next contends that it was incorrectly taxed on its subscription and newsstand sales from the period 1975-79. The Department increased the New Yorker's sales apportionable to Illinois for the period 1975-79 from its reported Illinois subscription sales to all newsstand and subscription sales not taxed in other jurisdictions. As previously stated, the Act attributes sales to Illinois where property is delivered or shipped to a purchaser in Illinois (Ill. Rev. Stat. 1977, ch. 120, par. 3—304(a)(3)(B)(i)) or, under its "throwback" provision, where the person is not taxed in the State of destination and the property is shipped from an "office, store, warehouse, factory or other place of storage in [Illinois]" (Ill. Rev. Stat. 1977, ch. 120, par. 3—304(a)(3)(B)(ii)). While the Department increased the New Yorker's subscription and newsstand sales for the years 1975-79 under the latter provision, it did not increase the sales for the period subsequent to 1979 due to a statutory amendment, effective September 7, 1979, which added the following proviso to section 3—304—(a)(3)(B)(ii) of the Act:

> "[P]rovided, however, that premises owned or leased by a person who has independently contracted with the seller for the printing of newspapers, periodicals or books shall not be

deemed to be an office, store, warehouse, factory or other place of storage for purposes of this Section." Pub. Act 81—478, effective September 7, 1979 (amending Ill. Rev. Stat. 1977, ch. 120, par. 3—304(a)(3)(B)(ii)).

The New Yorker argues that the "throwback" rule in subsection (B)(ii) is inapplicable to its situation (1) because the 1979 amendment excluding commercial printers from subsection (B)(ii) merely clarified the existing law, and (2) alternatively, because the New Yorker's printer cannot be found to be the place of shipment in Illinois. Instead, it urges that the applicable provision is subsection (B)(i), and, thus, only the newsstand and subscription sales shipped to the initial purchaser in Illinois are taxable.[1]

█ We find that the 1979 legislative amendment to the "throwback" provision does not demonstrate that the provision is inapplicable to the New Yorker for the years prior to the amendment. It is presumed when the legislature enacts an amendment that a change in the existing law was intended (*Chicago & Illinois Midland Ry. Co. v. Department of Revenue* (1976), 63 Ill. 2d 474, 481, 349 N.E.2d 22, 26), but this presumption may be rebutted by circumstances surrounding the enactment which indicate that the legislature intended only to interpret the original act (*O'Connor v. A. & P. Enterprises* (1980), 81 Ill. 2d 260, 271, 403 N.E.2d 204, 209). The New Yorker places great emphasis on the fact that, during debates on the amendment, representatives in the General Assembly commented that the revenues in issue had never been collected in Illinois previously and that the Department intended to begin to collect the tax. This is inadequate to rebut the presumption here. Nowhere in the legislative histories is there mention of a purpose to clarify the existing language. In fact, the history is replete with references to creating an "exemption" for independent printing plants. See 81st Ill. Gen. Assem., Senate Proceedings, May 17, 1979, at 81; 81st Ill. Gen. Assem., Senate Proceedings, June 15, 1979, at 133, 134.

█ We further find that the circuit court did not err in conclud-

---

[1] It appears the New Yorker's position is that if it were taxed solely under subsection (B)(i), the only tax on its newsstand sales would be for those newsstand copies picked up by wholesalers in Chicago because the initial purchaser was the Philadelphia-based independent contractor with which it had contracted to sell the magazines. The New Yorker cites two cases from other jurisdictions to support its position relating to initial purchasers, *Department of Revenue v. Parker Banana Co.* (Fla. App. 1980), 391 So. 2d 762, and *Olympia Brewing Co. v. Commissioner of Revenue* (Minn. 1982), 326 N.W.2d 642. Because we find that the New Yorker was properly taxed under subsection (B)(ii) of the Act, we need not address this contention.

ing that the property here was shipped from an "office, store, warehouse, factory, or other place of storage in [Illinois]" for the years 1975-79, thereby subjecting the New Yorker to the Act's "throwback" provision. The record shows that the New Yorker entered into a contract with an Illinois printer not only to print its magazine but to be responsible for mailing, delivery, loading, hauling and shipping of the magazine. Although the magazines were shipped from the printer to various wholesalers pursuant to instructions from an independent contractor under contract with the New Yorker to distribute its magazine, the New Yorker determined the quantity of issues to be shipped and it had continued responsibilities relating to the shipments. The contract with the Illinois printer also required it to store press plates from the printing for a short period of time, to provide storage facilities for paper, and to store remaining copies of each issue of the magazine for two weeks before disposal, as directed by the New Yorker. We cannot conclude from this record that the administrative finding that the magazines were "shipped from an office, store, warehouse, factory or other place of storage in [Illinois]" is against the manifest weight of the evidence.

Concluding that Illinois' apportionment provisions were correctly applied to the New Yorker in the case at bar, we now turn to the New Yorker's contention that the statutory apportionment as applied to it cannot survive constitutional scrutiny. The New Yorker directs us to the following as indicative that the taxation here is out of appropriate proportion to its business conducted in Illinois and results in an unconstitutional overlap in taxation. Before the tax increases in issue here, the New Yorker was taxed on 40% of its subscription and newsstand revenues, 4.7% of which was apportioned to Illinois. All jurisdictions taxed the New Yorker on 70% of its total advertising revenue. After the increases, 64% of the New Yorker's circulation revenues and 64% of its advertising revenues were apportioned to Illinois. All jurisdictions taxed the New Yorker on 120% of its combined circulation and advertising revenue earned and 128% of its advertising revenue earned.

■■ We first note in evaluating these percentages that, in placing much emphasis on the fact that a great portion of its advertising functions were performed outside of Illinois yet Illinois taxed 64% of those revenues, the New Yorker ignores the fact that advertising is an integral part of and inseparable from other aspects of the publication of the magazine. In addition, by focusing solely on the sales factor of the apportionment formula, the New Yorker overlooks the proper constitutional analysis here. United States Supreme Court case

law has demonstrated that the appropriate focus is not on the proportions of one aspect of the business, as may be reflected in one factor of the formula, but on the relationship between the income attributed to a State and the value of all of its business activities.

In *Underwood Typewriter Co. v. Chamberlain* (1920), 254 U.S. 113, 65 L. Ed. 165, 41 S. Ct. 45, the Supreme Court, faced with a one-factor formula, held that a corporation did not meet its burden of showing an unconstitutional apportionment by relying on the fact that the State received only 3% of the corporation's net income yet taxed 47% of its income. The court emphasized that the profits of the corporation were earned by a series of transactions beginning with the manufacture in the State in issue and ending with sale in other States. *Underwood*, 254 U.S. at 120, 65 L. Ed. at 169, 41 S. Ct. at 47.

■ Illinois' three-factor formula, combining the property, payroll and sales factors, is designed to adjust for variances in any given factor so that the factors together represent "business activity." The United States Supreme Court has recognized the wide approval of the three-factor formula because the payroll, property, and sales, in combination, reflect a large share of the activities by which value is generated and are able to avoid gross distortions. *Container Corp.*, 463 U.S. at 183, 77 L. Ed. 2d at 565, 103 S. Ct. at 2949.

■ Based upon these three factors, 22% to 30% of the New Yorker's income for the years 1975-79 was attributed to Illinois, while New York received 65% to 70% of its income. During this period, the magazine was printed in, packaged in, and shipped from Illinois. Some of the magazines were sold to Illinois consumers through subscription and newsstand sales. The New Yorker maintained a branch office in Chicago, employing several employees to solicit advertising, and employed a permanent clerical employee and a rotating employee to be stationed at the printing plant. Based upon this business activity and the fact that no other state except New York has greater business activity than Illinois, we find that the New Yorker has not met the constitutional standards that there be no "minimal connection" between its activities and the taxing state or no "rational relationship" between 22% to 30% income attributed to Illinois and the New Yorker's business activities. *ASARCO*, 458 U.S. at 317, 73 L. Ed. 2d at 795, 102 S. Ct. at 3109; *Exxon Corp.*, 447 U.S. at 219-20, 65 L. Ed. 2d at 79, 100 S. Ct. at 2118.

■ Moreover, the New Yorker has not met its burden of showing an overlap in taxation which results in gross distortions. The total business income here, based upon all three factors taxed by all juris-

dictions during the six years in issue, ranged from 85% to 103%.[2] This slight overage does not render the formula's application here unconstitutional. The Supreme Court has recognized the inherent margin of error in any apportionment method and that some risk of duplicative taxation will exist with the states' varying tax formulas. (*Container Corp.*, 463 U.S. at 183-84, 77 L. Ed. 2d at 565, 103 S. Ct. at 2949-50; *Moorman*, 437 U.S. at 278, 57 L. Ed. 2d at 207-08, 98 S. Ct. at 2347.) The Illinois Supreme Court has also stated that the purpose of Illinois' three-factor apportionment formula is to assure not only that a corporation's business income is not overtaxed but also to avoid any gap in taxing all business income. *GTE Automatic Electric, Inc. v. Allphin* (1977), 68 Ill. 2d 326, 335, 369 N.E.2d 841, 846-47.

Accordingly, we affirm the circuit court's order upholding the Department's decisions regarding the New Yorker's tax deficiencies for the periods 1975-77 and 1979-81.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.

---

[2]The figures submitted by the New Yorker in the circuit court were slightly higher due to the inclusion of a proposed California assessment at approximately 5% rather than 2%. The total business income subject to taxation based upon this variation would be 103.85% for 1975, 101.97% for 1976, and 103.85% for 1977.